Brookwood Medical Center appeals from a judgment entered on a jury verdict in favor of the plaintiff Woodie Lindstrom. We reverse and remand.
On June 13, 1995, Woodie Lindstrom, then age 77, was admitted to the hospital operated by Brookwood Medical Center ("Brookwood") for observation in connection with a "heart flutter." That night, she was "agitated" and confused about her location. Fearing that she might fall, the medical staff ordered her to remain in bed and raised the bed rails. Because she refused to stay in bed, she was given medication to induce sleep. Despite these measures, Lindstrom continued to get out of bed and to walk, "dragging" with her the medical apparatus to which she was connected.
Lindstrom's medical chart indicated that at approximately 1:00 a.m. she was restrained, in bed, by means of a "vest restraint" attached to the bed. Despite the vest restraint, Lindstrom managed to climb out of bed, and the medical staff found her standing beside the bed. A medical-chart entry made at 6:45 a.m. recorded the use of "wrist restraints" as a supplemental measure. Specifically, the notation read: "Resting at this time, vest and wrist restraints on." However, at approximately 7:20 a.m., Lindstrom climbed out of bed, fell, and broke her hip.
On January 29, 1996, she sued Brookwood, alleging that it had "negligently caused or. . . allowed [her] to fall in her room." The action was tried to a jury. The court denied Brookwood's motion for a judgment as as matter of law, and the jury awarded Lindstrom $162,500. The court entered a judgment on that verdict. Brookwood has appealed, contending that, as to the question whether Brookwood breached the standard of care it owed Lindstrom, she had failed to produce evidence sufficient to overcome its motion for a judgment as a matter of law. We agree with this contention.
A judgment as a matter of law "is proper (1) where the nonmoving party has failed to present substantial evidence regarding some element essential to her claim, or (2) where there is no disputed issue of fact upon which reasonable persons could differ." Teague v. Adams, 638 So.2d 836, 837 (Ala. 1994). "In medical malpractice cases, the plaintiff must prove that the alleged negligence `probably caused the injury.'" McAfee v.Baptist Medical Ctr., 641 So.2d 265, 267 (Ala. 1994). "The plaintiff must prove the alleged negligence through expert testimony, unless an understanding of the alleged lack of due care or skill requires only common knowledge or experience." Id.
The only evidence Lindstrom produced relating to the question whether Brookwood breached the appropriate standard of care consisted of the testimony of Brookwood's own medical personnel. Lindstrom argues: "There is no requirement that [proof of] the standard of care must come from an independent expert — it can be provided by the Defendant." Brief of Appellee, at 14 (emphasis added). To be sure, "the defendant himself can establish the expert testimony required in a medical negligence case." Dobbs v.Smith, 514 So.2d 871, 872 (Ala. 1987). But such evidence, to serve the purpose for which the plaintiff attempts to use it, must not only identify the standard, but also identify conduct that amounts to a breach of that standard. See Dobbs, supra
(testimony of defendant-expert did not establish "a deviation from [the] standard"). In other *Page 953 
words, expert testimony in a medical-negligence case must show in what respect the defendant's conduct deviated from the appropriate standard. That is the sense in which Lindstrom's evidence was deficient.
Specifically, the standard of care was established through the testimony of Nurse Karen Stamps. She identified essentially three methods appropriate for protecting patients who are disoriented and in danger of falling. First, she said, such patients are "reorient[ed]," that is, they are told "where they are,. . . where the call light is, where the bathroom is, [and] how to call for the nurse if they need assistance." If the first method is ineffective, patients are then medicated. As a last resort, patients are restrained.
In that connection, Stamps testified as follows:
 "Q. [By Lindstrom's counsel] Now, when it comes to the point where restraints are used, is there a line of which ones you use first, which ones are the most drastic, things of that nature?
"A. [Stamps] Yes.
"Q. How are they done?
 "A. All four bed rails first, then a vest, and then wrist or ankle [restraints]."
In addition, the standard of care — Lindstrom concedes — required only that "the nursing staff. . . check the patient everyone hour to assure that the restraints are tied properly." Briefof Appellee, at 4 (emphasis added). All of Brookwood's medical personnel testified that this procedure was followed in this case and that there was no deviation from the standard of care.
Lindstrom's theory of the case is that the testimony indicates confusion on the part of the witnesses as to "what
restraints were on [her before she fell and] whether they were properly and securely tied." Brief of Appellee, at 17 (emphasis added). She sums up this confusion in the testimony as follows:
 "The nursing supervisor [Lori Busby] said that when she came to the room immediately after the fall, [Lindstrom's] vest restraint was up on the bed by her pillow while she was on the floor. Nurse [Patsy] McBride testified that she was the first one to [Lindstrom] and that she had her vest restraint still on, [besides] wrist restraints and ankle restraints. Nurse Busby said there were no ankle restraints."
Id. (citations to the record omitted). This evidence of confusion, she argues, was sufficient to defeat Brookwood's motion for a judgment as a matter of law. We disagree.
Actually, the case turns on whether there was substantial evidence indicating that at some point within one hour before her fall Lindstrom was not restrained with wrist restraints. This is so, because no one contends that the vest restraint was removed by anyone other than Lindstrom. Therefore, the precise position of the vest, that is, whether it was on the bed or was still on Lindstrom is immaterial. The point is, it is undisputed that the vest restraint was in use at the time of the fall. Also, Stamps testified that the wrist restraints were a more "drastic" form of restraint than the vest restraint, and that the standard of care did not require both wrist and ankle restraints. Thus, the "confusion" to which Lindstrom refers could present a jury question only if there was substantial evidence from which a jury could find that Brookwood used neither wrist nor ankle restraints. In other words, Brookwood was entitled to a judgment as a matter of law unless there was a genuine conflict in the evidence as to the use of both wrist and ankle restraints.
To support her contention that such a conflict existed, Lindstrom relies on a "quality-assurance incident report" prepared by Lori Busby, who was the "charge nurse"[1] at the time of Lindstrom's accident. *Page 954 
The report stated: "A PCA [patient-care assistant] entered the room to weigh the patient and found her beside the bed, swaying. She had gotten out of a vest restraint and gone over her side rails. Before the PCA could get to her, she fell, striking her head on the floor." Lindstrom relies on the fact that Busby's report did not state, for example: "She had gotten out of a vest restraint and wristrestraints." In other words, the report does not specifically mention wrist restraints.
However, Lindstrom called Busby to testify at trial as an adverse witness. She testified unequivocally that Lindstrom also was restrained at the wrist when she fell. More specifically, she stated:
 "Q. [By Lindstrom's counsel] [Y]ou have [in the report] that she had gotten out of a vest restraint. No mention of any wrist restraints?
"A. [Busby] Correct.
"Q. Or ankle restraints?
"A. Correct.
 "Q. And yet, you are telling us that you remember seeing wrist restraints?
"A. Yes, sir. I remember seeing one wrist restraint on her.
". . . .
 "Q. Could you tell us why. . . , if she really had on wrist restraints, why you didn't mention it in your report?
 "A. No, sir. The report was to document the fall — document the incident.
 "Q. Restraints are important to be documented in charts, aren't they?
"A. Correct.
 "Q. They have to be documented when they are done — documented when they are checked, right?
"A. Correct.
". . . .
 "Q. But you left out wrist [restraint]. But you are telling us today: `I saw at least one wrist restraint on her'?
"A. Yes, sir."
(Reporter's Transcript at 397-99.) (Emphasis added.)
A mere omission in a report does not constitute substantial evidence indicating the nonexistence of a fact that could have been recorded. Certainly, the omission in Busby's report did not constitute substantial evidence, when evidence of the existence of the omitted fact was supplied at trial by Busby's full and unequivocal testimony. In other words, there was no conflict between the report's nonstatement and Busby's affirmativestatement, that would require a jury's resolution. Also, Patsy McBride, who was the first nurse into Lindstrom's room after she fell, testified unequivocally that Lindstrom was restrained at the wrist at the time of her fall. For example, she said:
 "Q. [By Lindstrom's counsel] And you told me that one of her arms still had a wrist restraint tied to the bed frame and it was still on her wrist?
"A. Right."
(Reporter's Transcript at 360.) (Emphasis added.) The last medical-chart entry made before the accident read: "Resting at this time, vest and wrist restraints on." In essence, the evidence was unrefuted that Lindstrom was restrained at the wrists a mere 35 minutes before the accident — well within the undisputed once-per-hour monitoring period.
Finally, Stamps testified that the restraints at issue in this case are not inescapable, even when they are correctly andproperly applied. There was no evidence that the restraints were improperly applied in this case. On the contrary, all the witnesses who testified as to the standard of care testified that the restraints were properly applied and that Lindstrom was frequently and properly monitored. For example, Stamps testified as follows: *Page 955 
 "Q. [By Brookwood's counsel] Now, between 5:30 [a.m.] and the time we know that she fell, or she was found around 7:20 [a.m.], did you check her again before you went home?
"A. [By Nurse Stamps] Yes, I did.
"Q. And did you make a note of that?
"A. Yes, I did.
 "Q. All right. I guess we've already seen it, but is this the note that we're talking about at 6:45 [a.m.]?
"A. Correct.
"Q. What did you do at 6:45?
 "A. I went in to look at her, make sure the restraints were tied to the bed frame, and that they weren't too tight.
 "Q. At the time that you checked her, did you document at that time that she had a vest and wrist restraints on?
"A. Yes, I did.
"Q. Did she have ankle restraints on?
"A. No, she did not.
 "Q. At the time that you saw her, did you feel like she was appropriately restrained?
"A. Yes, I did.
"Q. Did you check her restraints?
"A. Yes.
 "Q. And throughout your shift, did you monitor her appropriately?
"A. Yes.
 "Q. Did you meet the standard of care in giving your care to Ms. Lindstrom?
"A. Yes, I did.
 "Q. Did you do what you thought was best for her at all times during the shift?
"A. Yes, I did.
 "Q. Well, you found out, I guess, the next day, that she had fallen?
"A. Yes.
"Q. Were you surprised?
"A. Yes.
"Q. Why were you surprised?
"A. Because she was restrained when I left.
 "Q. Well, let's talk about that a minute. Now, in your experience have you seen where patients have gotten out of restraints before?
"A. Yes, I have.
 "Q. Well, is it your opinion, Karen, that patients who are properly restrained in a vest and wrist restraints can get out of their restraints?
"A. Yes, they can.
"Q. Can you explain that?
 "A. They just keep working at things and the slip knot gets tighter down there, which makes the restraint looser. Sometimes they can slip the whole wrist off this way.
"Q. The wrist restraint, itself, they can slip it?
"A. Yes. They can slip that off their hand.
"Q. Have you seen them do that before?
"A. Yes, I have.
". . . .
"Q. Have you seen it in your practice?
"A. I sure have.
 "Q. Even when you are closely monitoring these patients, and even when those restraints are properly applied, have you seen it?
"A. Yes, I have.
 "Q. You talked about constant attention. Is there any way you can be with a patient every second?
"A. No.
"Q. Why not?
"A. Because I had several other patients that night.
"Q. You have other patients to take care of?
"A. Correct.
"Q. But in this case were you with Ms. Lindstrom frequently?
"A. Very frequently. *Page 956 
"Q. Did you monitor her appropriately?
"A. Yes, I did.
(Reporter's Transcript at 298-317.)
In this connection, "[w]hen evidence points equally to inferences that are favorable and to inferences that are unfavorable to the moving party, the evidence lacks probative value; and the evidence may not be used to support one inference over another because such use is mere conjecture and speculation."Turner v. Azalea Box Co., 508 So.2d 253, 254 (Ala. 1987). Thus, evidence that equally establishes the possibility that Lindstrom slipped out of a properly secured wrist restraint and the possibility that she escaped from an improperly secured wrist restraint does not constitute substantial evidence of a breach of the standard of care.
In short, there was no "disputed issue of fact upon which reasonable persons could differ." Teague, 638 So.2d at 837. The trial court erred, therefore, in denying Brookwood's motion for a judgment as a matter of law.
For these reasons, the judgment of the trial court is reversed and the cause is remanded for an order or further proceedings consistent with this opinion.
REVERSED AND REMANDED.
MADDOX, HOUSTON, SEE, LYONS, BROWN, and ENGLAND, JJ., concur.
JOHNSTONE, J., dissents.
[1] A "charge nurse" is responsible for "assigning the other nurses their patient assignments for the day." (Testimony of Lori Busby, R.N., Reporter's Transcript at 388.)