831 So.2d 38 (2001)
Nannie ERVIN
v.
EXCEL PROPERTIES, INC., d/b/a Madison Haven II Apartments.
2000870.
Court of Civil Appeals of Alabama.
December 21, 2001.
Certiorari Denied March 29, 2002.
*40 Derek W. Simpson of Simpson, Simpson & Willisson, Huntsville; and J. Barton Warren, Huntsville, for appellant.
Robert P. Fann of Fann & Rea, P.C., Birmingham, for appellee.
Alabama Supreme Court 1010723.
PER CURIAM.
Nannie Ervin, a resident of Madison Haven II Apartments, sued Excel Properties, Inc., d/b/a Madison Haven II Apartments ("Excel"), on June 30, 2000, alleging that Excel had negligently or wantonly failed to repair a defective and unreasonably dangerous stairwell at the apartment complex at which she resided and that its failure to do so caused her to fall and sustain injuries. Excel moved for a summary judgment on March 19, 2001. After conducting a hearing, the court, on April 30, 2001, entered a summary judgment in favor of Excel. Ervin appealed. This case was transferred to this court by the supreme court, pursuant to § 12-2-7, Ala. Code 1975.
In reviewing the disposition of a motion for summary judgment, we use the same standard the trial court used in determining whether the evidence before it presented a genuine issue of material fact and whether the movant was entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala.1988). When the movant makes a prima facie showing that no genuine issue of material fact exists, the burden then shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794 (Ala.1989). Evidence is "substantial" if it is of "such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). This court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala.1990). We also note that a summary judgment is rarely appropriate in negligence and personal-injury cases. Hutto v. Gold's Gym, Inc., 703 So.2d 974 (Ala.Civ.App.1996).
A tenant in an apartment complex shares the same legal rights as an invitee with respect to the common areas of the complex. Shelton v. Boston Fin., *41 Inc., 638 So.2d 824 (Ala.1994). Our supreme court has stated:
"A landowner owes an invitee the legal duty `to exercise reasonable care and diligence to keep the premises in a reasonably safe condition for the uses contemplated by the invitation, and to warn the invitee of known dangers, or dangers that ought to have been known, and of which the invitee was ignorant.' Lamson & Sessions Bolt Co. v. McCarty, 234 Ala. 60, at 62, 173 So. 388 (1937)."
Id. at 825. To recover in a premises-liability action based on a fall, a plaintiff must prove (1) that her fall was caused by a defect or instrumentality located on the defendant's premises, (2) that the fall was the result of the defendant's negligence, and (3) that the defendant had or should have had notice of the defect or instrumentality before the accident. Logan v. Winn-Dixie Atlanta, Inc., 594 So.2d 83, 84 (Ala.1992). An owner of the premises is not an insurer of the safety of his invitees, and the doctrine of res ipsa loquitur is not applicable. Ex parte Mountain Top Indoor Flea Market, Inc., 699 So.2d 158 (Ala. 1997). No presumption of negligence arises out of the mere fact of an injury to the invitee. Id. Additionally, with regard to wantonness, our supreme court has stated:
"`Wantonness' has been defined by this Court as the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result. To prove wantonness, it is not essential to prove that the defendant entertained a specific design or intent to injure the plaintiff."
Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250, 1256 (Ala.1998) (citations omitted).
The record indicates that Ervin had a congenital hip problem and that she sought treatment from her physician on November 11, 1999, for symptoms of pain and numbness in her legs. On November 17, 1999, Ervin was involved in an automobile accident. In that accident, Ervin suffered injuries to both of her knees. Ervin was off work for approximately two months after the November 17, 1999, automobile accident. Ervin was scheduled to return to work in the first week of January 2000.
However, on December 26, 1999, while descending the concrete steps outside her apartment, Ervin fell. Ervin stated in her affidavit that it felt as if something "grabbed" her heel and caused her to fall. As a result of the fall, Ervin sustained a tri-malleolar fracture subluxation of her right ankle. Dr. Howard Miller, Ervin's treating physician, testified that Ervin's injury is consistent with a "twisting-type" mechanism, and that it was consistent with the fall that she described.
In her deposition, Ervin described the incident in which she fell as follows:
"Q. I read over the complaint and I have read over the answers to interrogatories, and they talk in terms of there being a defect of some kind in the stairs, but nothing specific about it. Would you be so kind as to let me know what it was that you felt was defective about the stairs that led to you fall?
"A. I was going down my steps, and my foot hit something. My body twisted, and I just fell on the ground by the steps.
"Q. Your foot hit something. I'm going to try to break this down a little bit, if I can. Which foot are we talking about?
"A. My right foot.
". . . .
"Q. On those photographs, which are the Polaroids taken from Defendant's *42 Exhibit 1, are you able to identify whatever it is that caused you to fall on the date you were injured?
"A. No, sir.
"Q. Do you know what you fell on?
"A. No, sir. My foot just hit something and I fell.
"Q. It just hit something? You're certain your foot struck something?
"A. I know it struck something. It turned my body, and I fell down by my steps.
"Q. So your right foot, as you were stepping down, struck something?
"A. Yes.
"Q. Was it the step?
"A. I would say it was the step. It hit something. It was something, yes, sir.
"Q. Could it have been something on the step?
"A. I don't know, sir.
"Q. You just have no idea what it was that you
"A. What I hit, but it was something on the step.
"Q. Were you watching where you were stepping?
"A. As usual. I mean, there wasn't anything different about that day. I was just walking as I usually go down my steps.
"Q. And were you looking at the steps as you were going down?
"A. Yes, sir.
"Q. Did you see anything present on the steps?
"A. No, sir, I didn't.
"Q. Do you know what step you were about to place your right foot upon when you fell, what particular step it was?
". . . .
"A. It was about three steps from the bottom.
"Q. It would be the third step?
"A. From the bottom, yes, sir. I would say the third step from the bottom.
". . . .
"Q. You heard your attorney ask [Larry Traweek] questions regarding loose concrete. Did you ever see any loose concrete on the steps?
"A. Yes, sir.
"Q. Did you fall on loose concrete?
"A. My foot hit something. I do not know.
"Q. So you have no indication or no evidence that you fell on loose concrete?
"A. No, sir.
"Q. You heard your attorney ask Mr. Traweek about some loose metal on the steps; is that correct?
"A. Yes, sir.
"Q. Did you strike any loose metal? Did that cause you to fall?
"A. My foot hit something, sir.
"Q. Again, you have no evidence that you struck any loose metal on the steps?
"A. I do not know what it was. My foot hit something, yes, sir."
The steps on which Ervin fell consist of metal frames that are filled with concrete; each frame is welded to two supporting beams. Ervin described the steps as having loose concrete and protruding metal framing, and she stated that the concrete was "coming out of the steps." Ervin testified that approximately seven to eight months before her fall she had complained to Jim Smith, the maintenance man at the apartment complex, regarding the condition of the steps. Ervin stated that Smith had informed her that "they [were] going to work on the steps."
Larry Traweek, the president of Excel, testified that before Ervin's accident in December 1999, he and Smith had inspected *43 all the steps in the apartment complex after they had received a complaint from a resident, whose name he could not remember. Traweek testified that he determined that the steps were structurally sound; however, he said he did notice evidence of corrosion around the metal framing where the concrete was poured into the frame. Traweek testified in his deposition as follows:
"Q. Prior to December 26, 1999, did Excel Properties undertake to repair any of the stairs located at Excel Properties?
"A. December 26 being what, the day that Ms. Ervin had heryes, yes. What we did is we boughtmyself and Jim Smith and this guy Ralph I was telling you aboutwe bought the tools. In fact, I think we did it inwe may have done it in '98. It was quite some time before, I think, the accident. But we inspected the stairs and we saw that there was evidence of corrosion, especially on the front side of the stairs. But I inspected the underside of the stairs and, like I said, I'm an engineer. I've got a little bit of capability to judge things. There was not any structural defect in the stairs; it was simply there was some material that was starting to corrode around the box piece where the concrete was poured in. We decided that that was an issue and we decided to repair that. And the way we decided to repair it, since there was no structural issue, was to grind that down and put an RTV sealant to try to stem the corrosion. But essentially it was to get any other jagged metal pieces, primarily on the front side of the steps, where anybody could hurt themselves. And we went and did that to all the stairways.
"Q. That was done in what year, do you think?
"A. I think it was done betweenI think it was primarily done in 1998. I think it was done prior to November of '98. And maybe it was still ongoing in November, but I believe the year 1998 we spent quite a bit of time doing that. So it could be that we had done a little bit in early '99, but we had completed that, I think, prior to her accident.
". . . .
"Q. And you viewed these and looked at them and thought that the structure was fine, that they were welded to the side?
"A. Yes. There wasn't any evidence to me that there would be a structural problem with the stairs. Simply, like I say, the corrosion on the interior, from the interior of the stair, was starting on thefor example, on the front face of the stairs, in walking up, there would be some metal there. So that's what we decided to remove.
"Q. And what you did is decided to cut the
"A. Cut the ribbons back.
"Q.ribbons back, and then
"A. Grind that down.
"Q.grind down the concrete?
"A. No, grind down the edge of the metal that was remaining, and then put a sealant over that. I think we probably abandoned some of the sealant after a while because it wasn't holding properly because it was too dirty, and we had to clean it too much. But, primarily, the idea was to get the metal pieces out of the way so that there wasn't an issue with somebody cutting themselves.
". . . .
"Q. And to the best of your recollection, that was done to every stair at Madison Haven?
"A. Every one that needed it, yes. That is my recollection." *44 Traweek testified that he considered the repairs a successful "stop-gap" measure that would serve to remedy the problem until Excel could replace the steps. When questioned as to why he did not replace the steps, Traweek stated that he was spending money on other repairs in the complex and decided that the steps could wait.
Ervin argues that Excel failed to present substantial evidence that it maintained the stairwell in a reasonably safe condition; therefore, she argues, the trial court erred in entering a summary judgment in favor of Excel. Excel argues on appeal, as it did in its motion for summary judgment, that because Ervin was unable to identify the specific cause of her fall, it was entitled to a summary judgment on her claim.
"`"Proof which goes no further than to show an injury could have occurred in an alleged way, does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause." [Southworth v. Shea, 131 Ala. 419, 421, 30 So. 774, 775 (1901).]
"`But a nice discrimination must be exercised in the application of this principle. As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only. On the other hand, if there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence.'
"Southern Ry. v. Dickson, 211 Ala. 481, 486, 100 So. 665, 669 (1924) [footnote omitted]."
Ex parte Diversey Corp., 742 So.2d 1250, 1254 (Ala.1999) (reversing this court's reversal of a summary judgment and holding that the plaintiff's theory of recovery was based on "conjecture" regarding the cause of her injury).
We recognize that our supreme court has stated:
"Findings of facts cannot be based upon mere conjecture, of course, but it is also clear that direct evidence is not necessary to prove negligence on the part of a defendant and that proof of negligence may be established completely through circumstantial evidence. This Court has recognized that although the evidence may present no direct proof of negligence by the defendant, negligence does not require direct proof but may be inferred by a jury from the circumstances out of which the injury arose. A fact is established by circumstantial evidence if it can be reasonably inferred from the facts and circumstances adduced."
Bell v. Colony Apartments Co., Ltd., 568 So.2d 805, 810-11 (Ala.1990) (citations omitted) (footnote quoting Southern Ry. v. Dickson, supra, omitted). The court in Bell v. Colony Apartments Co., Ltd., supra, concluded that the circumstantial evidence in that case defeated the defendant's motion for a summary judgment.
In this case, the evidence, viewed in a light most favorable to Ervin, indicates that Ervin was injured when she fell while descending the steps outside her apartment. Although Ervin could not identify the specific cause of her fall, she *45 attributed it to the condition of the steps, which she described as having loose concrete and protruding metal framing with concrete "coming out of the steps." However, Ervin was unable to testify regarding the condition of the steps on the day of her fall. Ervin stated that her foot struck something on the step and that her body was caused to twist and she was caused to fall. Ervin testified that before her fall she had not considered the steps a hazard, and she testified that she did not know what caused her fall.
Traweek testified that in 1998 he had made repairs to the steps by correcting some corrosion around the metal framing of the steps, grinding down some "jagged metal pieces" on the front of the metal frame, and covering the steps with a sealant. Traweek testified that he inspected the steps regularly and that there was no loose concrete on the steps after he made the repairs in 1998.
Although Ervin attributed her fall to an alleged faulty condition of the steps, her testimony establishes that she was not certain what made her fall. Ervin's testimony was that her foot hit "something," but she had no evidence and did not know whether that "something" was some condition of the steps. Ervin has advanced one theory regarding the cause of her fall. However, the possible condition of the steps is only one potential cause of Ervin's fall and injury; more than one plausible explanation of the cause of Ervin's fall exists. "`[T]he mere possibility that a careless act caused damage is not itself sufficient to find proximate cause.'" Bell v. Colony Apartments Co., Ltd., 568 So.2d at 810. Further, "mere conclusory allegations or speculation that fact issues exist will not defeat a properly supported summary judgment motion, and bare argument or conjecture does not satisfy the nonmoving party's burden to offer facts to defeat the motion." Hurst v. Alabama Power Co., 675 So.2d 397, 400 (Ala.1996). We cannot say that the evidence supports an inference that a defective condition of Excel's steps caused Ervin's fall. Therefore, we cannot say that Ervin established the element of her claim that required her to present evidence that her fall was caused by a defect or instrumentality located on Excel's premises. Logan v. Winn-Dixie Atlanta, Inc., supra. We conclude that this is one of the rare cases in which summary judgment is appropriate in a negligence action. Therefore, we affirm the summary judgment entered on Ervin's negligence claim.
Ervin also argues that the trial court erred in entering a summary judgment on her wantonness claim. After reviewing the evidence in the record, we are unable to conclude that Ervin has established that Excel consciously performed an act or omitted a duty with the knowledge that its conduct would likely or probably result in injury. See Alfa Mut. Ins. Co. v. Roush, supra. Therefore, we cannot say that Ervin established that Excel's conduct rose to the level of wantonness.
The summary judgment in favor of Excel is due to be affirmed.
AFFIRMED.
CRAWLEY, THOMPSON, PITTMAN, and MURDOCK, JJ., concur.
YATES, P.J., dissents.
YATES, Presiding Judge, dissenting.
Because I believe that Ervin presented substantial evidence creating a question of fact as to her negligence and wantonness claims, I must respectfully dissent from the main opinion.
Excel argues on appeal, as it did in its motion for a summary judgment, that because Ervin was unable to identify the specific cause of her fall, it was entitled to *46 a summary judgment on her claim. Our supreme court has stated:
"Findings of facts cannot be based upon mere conjecture, of course, but it is also clear that direct evidence is not necessary to prove negligence on the part of a defendant and that proof of negligence may be established completely through circumstantial evidence. This Court has recognized that although the evidence may present no direct proof of negligence by the defendant, negligence does not require direct proof but may be inferred by a jury from the circumstances out of which the injury arose. A fact is established by circumstantial evidence if it can be reasonably inferred from the facts and circumstances adduced."
Bell v. Colony Apartments Co., Ltd., 568 So.2d 805, 810-11 (Ala.1990) (citations omitted) (footnote omitted). See also Harris v. Flagstar Enters., Inc., 685 So.2d 760 (Ala.Civ.App.1996).
The evidence, viewed in a light most favorable to Ervin, indicates that she was injured when she fell while descending the stairs outside her apartment. Although she could not identify the specific cause of her fall, she attributed it to the condition of the stairs, which she described as having loose concrete and protruding metal framing with concrete "coming out of the steps." Ervin stated that her foot struck something on the step that caused her body to twist and caused her to fall. Traweek acknowledged that he had notice of the condition of the steps in the apartment complex before the date of Ervin's accident and that he had set out to make repairs to the steps. He testified that he inspected the steps and noticed some corrosion around the metal framing of the steps and that the steps had some "jagged metal pieces" on the front of the metal frame. Traweek determined that to repair the steps he would grind down the protruding pieces of the metal frame and cover the steps with a sealant. After carefully reviewing the record in this case, I conclude that Ervin presented sufficient circumstantial evidence from which a jury could infer that her fall was caused by the condition of the stairs. Accordingly, I conclude that the trial court erred in entering the summary judgment against her on her negligence claim.
Excel does not in its brief address Ervin's wantonness claim. It is undisputed that before Ervin fell Traweek had knowledge that the stairs were in a state of disrepair. He testified that he had inspected the stairs and had noticed that they were corroding around the front of the metal frame; yet, rather than replacing the stairs, he had decided, because of economic considerations, to employ certain "stop-gap" measures to repair the stairs. Finally, although Excel contends that the stairs were not unsafe after the repairs, the condition of those stairs is properly a question for a jury. Accordingly, I also conclude that the trial court erred in entering the summary judgment in favor of Excel on Ervin's claim alleging wantonness.