THOMAS, Judge.
Hattie B. Shanklin sued New Pilgrim Towers, L.P. (“NPT”), and fictitiously named parties, alleging that she was injured as a result of the negligence, wantonness, and “breach of legal duties” on the part of NPT when she tripped and fell while using an elevator on NPT’s premises. NPT sought and received leave to file a third-party complaint against Schindler Elevator Corporation (“Schindler”); NPT later dismissed its claims against Schindler. Shanklin amended her complaint to name Schindler in the place of one of the fictitiously named parties. Both Schindler and NPT filed motions for a summary judgment; Shanklin responded. The trial court entered a summary judgment in favor of both defendants, and Shanklin appealed to the Alabama Supreme Court, which transferred the appeal to this court, pursuant to Ala.Code 1975, § 12-2-7(6).[1]
We review a summary judgment de novo; we apply the same standard as was applied in the trial court. A motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. A party moving for a summary judgment must make a prima facie showing “that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law.” Rule 56(c)(3); see Lee v. City of Gadsden, 592 So.2d 1036,1038 (Ala.1992). If the movant meets this burden, “the burden then shifts to the nonmovant to rebut the movant’s prima facie showing by ‘substantial evidence.’ ” Lee, 592 So.2d at 1038 (footnote omitted). “[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989); see Ala.Code 1975, § 12-21-12(d). Furthermore, when reviewing a summary judgment, the appellate court must view all the evidence in a light most favorable to the nonmovant and must entertain all reasonable inferences from the evidence that a jury would be entitled to draw. See Nationwide Prop. & Cas. Ins. Co. v. DPF Architects, P.C., 792 So.2d 369, 372 (Ala. 2000); and Fuqua v. Ingersolh-Rand Co., 591 So.2d 486, 487 (Ala.1991).
Based on the exhibits offered in support of and in opposition to the summary-judgment motions, the record reveals the following facts. Shanklin is a 76-year-old resident of a facility operated by NPT, which is an independent-living facility providing supportive services for the elderly and some mobility-impaired residents. NPT’s facility is a multistory facility, and it has two elevators. One elevator is a passenger elevator (“the passenger elevator”), while *1253 the other elevator is a larger elevator designed to carry both passengers and to serve as a freight elevator to assist in moving residents and their furniture in and out of the building (“the freight elevator”). If the freight elevator is not being utilized for a move, the residents can use it as they would the passenger elevator.
On October 2, 2006, Shanklin rode the freight elevator from her second-floor apartment down to the lobby to retrieve a package. The package was not heavy, weighing approximately seven pounds, so Shanklin did not take a cart with her. The package was approximately three feet in length and two feet in width; the package was around six to eight inches deep. Shanklin picked up her package at the lobby desk and proceeded to return to the elevator to return to her room. She said she could see around and over the package and that she could see the floor as she walked. As she approached the freight elevator, she said, someone was already inside the elevator and appeared to be pushing the button to hold open the doors for Shanklin. Shanklin recalled being able to see the floor of the elevator as she approached it. As Shanklin went to step into the elevator, she fell. Her head struck the back corner of the elevator, injuring her head; she also injured her knee in the fall. Shanklin’s injuries were severe enough to require surgery and a lengthy hospital stay.
The resident assistant at the front desk, Miriam Smith, heard the fall and responded by coming to the elevator. Once she discovered Shanklin, who was conscious and talking, Smith proceeded to call emergency personnel. Smith testified in her deposition that, when she saw the elevator after Shanklin’s fall, the elevator was “mis-leveled” approximately two to three inches. Smith, who lived in the building, testified that she had not personally encountered a problem with the elevators in the building but that she had been aware that some problems had occurred. She specifically stated that she did not recall there having been any problems with the elevators in the week before Shanklin’s accident.
A frequent visitor to NPT’s facility, Carrie Hardin, was at the lobby desk when Shanklin picked up her package. Hardin was also headed to the elevator when she heard Shanklin fall. According to her affidavit, when Hardin heard Shanklin fall, Hardin hurried to the elevator to render aid. Hardin testified that, when she arrived at the elevator, she “noticed that the elevator was not level with the floor by about 5 to 6 inches.” Hardin stated that she noticed no other hazards in the area that, in her opinion, would have caused Shanklin to fall; thus, Hardin opined that Shanklin’s fall had been caused by the “misleveled” condition of the elevator. Hardin also testified that she had observed the freight elevator in the same condition — not level with the floor — on one occasion approximately a year and a half before the October 2006 accident.
Shanklin herself testified to two incidents that she recalled where an elevator in the building had not been level with the floor. In addition, the record contains work tickets obtained from Schindler detailing certain service-call complaints and the maintenance work performed on the elevators in the building. One of those work tickets, dated March 2006, indicates that a service call was initiated by NPT because one of the elevators was not leveling on every floor. The other work ticket, dated May 2006, indicates that the freight elevator was not stopping on any floor between one and nine and that it was not leveling. Both work tickets indicate that the elevator technician located the cause of each problem and remedied it.
*1254 Samuel Robinson, the manager of NPT’s facility, testified that he oversees the daily operations of the building and supervises the staff. Robinson explained that elevator maintenance was not the responsibility of NPT’s maintenance staff but that NPT had a contract for maintenance on the elevators with Schindler. Robinson was not present when Shanklin’s accident occurred. He explained that Smith had telephoned him to report the accident. According to Robinson, Smith had informed him that the elevator was not level with the floor. Robinson said that he instructed Smith to “take the elevator out of service” until he could telephone Schindler to request service the next morning. Robinson said that he instructed Smith to use a toggle switch to make the elevator doors stay open and to place a bench in front of the elevator doors to prevent use of the elevator. Robinson testified that he could recall only a few times that the elevator had not been level with the floor in his 23-year tenure as manager; he admitted, however, that he had no way of knowing whether the elevator had ever not been level with the floor without his having any knowledge of it.
Robinson placed a service call to Schindler the morning after Shanklin’s accident. The technician who responded to the service call, Ronald Bell, testified in his deposition that, when he arrived that morning, the freight elevator was level with the lobby floor. He reported that he rode the elevator for some time, attempting to get it to “mislevel” as it had reportedly done the evening before, but with no success. Bell also explained that he spent some time in the machine room watching the operation of the elevator, again without any results indicating the reason why the elevator may not have been level with the floor the evening before.
On October 5, 2006, someone at NPT’s facility again placed a service call to Schindler about the freight elevator not leveling with the floor. George Scroggins responded to the service call. Scroggins testified in his deposition that, when he arrived to service the elevator, it was not running. However, Scroggins said that he adjusted a “1UL” switch on the elevator, and, he said, after that adjustment, the elevator “ran fine.”
The following day, someone at NPT’s facility placed a third service call to Schindler about the freight elevator. Jeff Dut-ton responded to this service call. Dutton testified that NPT reported that the freight elevator had been “misleveling” intermittently. When he arrived, however, Dutton said, the elevator was working properly. Dutton then decided to check and clean the “1UL” and “1DL” switches on the elevator as a method of troubleshooting the problem. The record contains no other indications that the freight elevator continued to malfunction in any manner after October 6, 2006.
Schindler presented the deposition testimony of John L. Donnelly as an expert in elevators and their maintenance. Donnelly had prepared a report in which he detailed two findings: (1) that he had found no evidence indicating that the alleged “misleveling” of the freight elevator resulted from any failure by Schindler to properly maintain or repair the elevator, and (2) that the elevator could have intermittently “misleveled” on the date of the accident for reasons unrelated to any action or inaction on the part of Schindler because elevators are complex electro-mechanical systems that can “mislevel” even when properly maintained and repaired. Don-nelly opined that an elevator that is not level with the floor is not a dangerous condition, because a person can avoid the danger posed by the “misleveled” condition *1255 of the elevator; Donnelly characterized a “misleveled” elevator as a “hazard.”
Donnelly was questioned at length.about two particular work tickets indicating that NPT had reported “misleveling” in the elevators. The first work ticket, dated March 2006, contained confusing notations not clearly indicating which of the two elevators was “misleveling”; the May 2006 work ticket clearly related to the freight elevator. Donnelly explained that, based on his knowledge of elevators, the May 2006 work ticket did not specifically concern a “misleveling” problem. According to Donnelly, the May 2006 work ticket indicated that the reported problem was that the elevator was not stopping on floors one through nine and that it was not leveling. Donnelly explained that, if an elevator does not stop on a given floor, it cannot level. In any event, the record indicates that the problems reported in March and May 2006 were resolved by the elevator technicians who responded to the service calls.
Shanklin herself testified that the freight elevator was functioning the day of the accident, noting that she had ridden that elevator to the lobby to retrieve her package. She also testified that, as far as she knew, the elevators in the building had been functioning fine the day before and even the week before her accident. She denied having any knowledge that the freight elevator was having problems on the date of the accident; she also admitted that she did not have any information indicating that Robinson had any knowledge of a problem with the freight elevator on that date.
Shanklin’s negligence claim against NPT is based on her status as tenant in the building; thus, the principles applicable to premises liability apply.
“A tenant in an apartment complex shares the same legal rights as an invitee with respect to the common areas of the complex. Shelton v. Boston Fin., Inc., 638 So.2d 824 (Ala.1994). Our supreme court has stated:
“ ‘A landowner owes an invitee the legal duty “to exercise reasonable care and diligence to keep the premises in a reasonably safe condition for the uses contemplated by the invitation, and to warn the invitee of known dangers, or dangers that ought to have been known, and of which the invitee was ignorant.” Lamson & Sessions Bolt Co. v. McCarty, 234 Ala. 60, at 62, 173 So. 388 (1937).’
“Id. at 825. To recover in a premises-liability action based on a fall, a plaintiff must prove (1) that her fall was caused by a defect or instrumentality located on the defendant’s premises, (2) that the fall was the result of the defendant’s negligence, and (3) that the defendant had or should have had notice of the defect or instrumentality before the accident. Logan v. Winn-Dixie Atlanta, Inc., 594 So.2d 83, 84 (Ala.1992). An owner of the premises is not an insurer of the safety of his invitees, and the doctrine of res ipsa loquitur is not applicable. Ex parte Mountain Top Indoor Flea Market, Inc., 699 So.2d 158 (Ala.1997). No presumption of negligence arises out of the mere fact of an injury to the invitee. Id.”
Ervin v. Excel Props., Inc., 831 So.2d 38, 40-41 (Ala.Civ.App. 2001).
In addition,
“ ‘[t]he owner of a premises ... is not an insurer of the safety of his invitees ..., and the principle of res ipsa loquitur is not applicable. There is no presumption of negligence which arises from the mere fact of an injury to an invitee.’ Tice v. Tice, 361 So.2d 1051, 1052 (Ala. 1978). In order to overcome a defen *1256 dant’s properly supported summary-judgment motion, the plaintiff bears the burden of presenting substantial evidence as to each disputed element of her claim. See Ex parte Atmore Community Hosp., 719 So.2d 1190 (Ala.1998); Mann v. Bank of Tallassee, 694 So.2d 1375 (Ala.Civ.App.1996).”
Ex parte Harold L. Martin Distrib. Co., 769 So.2d 313, 314 (Ala.2000).
Shanklin’s negligence claim against Schindler is based on her allegation that Schindler failed to properly service and repair the elevators in the building. Thus, general principles of negligence and wantonness apply to those claims.
“Alabama law defines ‘negligence’ as
“ ‘the omission to do something which a reasonable man, guided by those considerations which ordinarily regulate the conduct of human affairs, would do, or doing something which a prudent and reasonable man would not do, with reference to the situation and knowledge of the parties under all of the attendant circumstances.’
“Ryder Truck Lines, Inc. v. Brennan, 497 F.2d 230, 233(n.2) (5th Cir.1974). In order to present a prima facie case of negligent repair on [Schindler’s] part, [Shanklin] had the burden of presenting substantial evidence that, taking into account all of the attendant circumstances, [Schindler] did something or failed to do something that would violate the proper standard of care one must observe in repairing [an elevator].”
Brooks v. Colonial Chevrolet-Buick, Inc., 579 So.2d 1328, 1334 (Ala.1991). To overcome a properly supported summary-judgment motion, Shanklin must also have presented substantial evidence indicating that Schindler’s action or inaction proximately caused her injuries. See Martin v. Arnold, 643 So.2d 564, 567 (Ala.1994) (“To establish negligence, the plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury.”).
Shanklin also claimed that NPT and Schindler wantonly caused her injuries.
“ ‘ “Wantonness” has been defined by this Court as the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result. To prove wantonness, it is not essential to prove that the defendant entertained a specific design or intent to injure the plaintiff.’
“Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250,1256 (Ala.1998).”
Ervin, 831 So.2d at 41. “To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty. To be actionable, that act or omission must proximately cause the injury of which the plaintiff complains.” Martin, 643 So.2d at 567.
When asked to describe her accident and what had made her fall, Shanklin testified that she was not sure what had caused her to fall until Hardin informed her that the elevator was “misleveled.”
“A: .... See, that’s what I—I think [the ‘misleveled’ elevator] is what made me trip. I’m not sure. All I know, I just, when I stepped in there, I just flipped and hit the corner of the elevator.
[[Image here]]
“Q: Okay. Do you remember if your foot hit anything before you fell?
“A: I don’t know.
*1257 “Q: Okay. All you know is that you fell.
“A: Uh — huh. And I wouldn’t have known — If [Hardin] hadn’t said, ‘The elevator is not. all the way down,’ I wouldn’t have known.... ”
As noted above, Hardin testified in her affidavit that she had heard Shanklin fall. Hardin’s affidavit testimony contains only her speculation about what caused Shank-lin’s fall, which she admittedly did not witness. Shanklin herself testified that she did not know what made her fall, except that she had surmised, based on Hardin’s statements to her after the fall, that the elevator must have been “mislev-eled” and caused her to trip. Thus, as both Schindler and NPT argued in the trial court and argue in support of the trial court’s summary judgment on appeal, the evidence regarding the cause of Shanklin’s fall is insufficient to establish a genuine issue of material fact so as to meet Shank-lin’s burden in opposition to their summary-judgment motions.
“Alabama juries are not permitted to speculate as to the cause of an accident. See Brookwood Medical Ctr. v. Lindstrom, 763 So.2d 951 (Ala.2000); Turner v. Azalea Box Co., 508 So.2d 253, 254 (Ala.1987) (‘[w]hen evidence points equally to inferences that are favorable and to inferences that are unfavorable to the moving party, the evidence lacks probative value; and the evidence may not be used to support one inference over another because such use is mere conjecture and speculation’).”
Ex parte Harold L. Martin Distrib. Co., 769 So.2d at 815.
“ . Proof which goes no further than to show an injury could have occurred in an alleged way does not warrant the conclusion that it did so occur, where from the same proof the injury can, with equal probability, be attributed to some other cause. Such a condition is equivalent to an absence of evidence to the true cause, and, when seen clearly to exist, imposes on the court the duty of determining, as a matter of law, against any right of recovery dependent upon the establishment of the causal connection between the injury and the alleged cause_” ’ Maddox v. Ennis, 274 Ala. 229, 230, 231, 147 So.2d 788, 789 (1962), quoting from Southworth v. She[a], 131 Ala. 419, 30 So. 774 (1901).”
Peevy v. Alabama Power Co., 393 So.2d 971, 973 (Ala.1981).
In order to prevail against the summary-judgment motions, Shanklin was required to present substantial evidence indicating that the “misleveled” elevator caused her to fall. The evidence presented, while able to support the conclusion that Shanklin tripped on the “misleveled” elevator, points just as equally to the conclusion that Shanklin simply stumbled or tripped for no apparent reason. The after-the-fact testimony from Hardin and Smith establishing that the elevator was “misleveled” after Shanklin’s fall does not establish that the elevator was “mislev-eled” at the time Shanklin attempted to enter the elevator. Shanklin testified that she saw the floor of the elevator as she approached it. Shanklin’s own testimony was that she did not know if her foot struck anything to cause her to stumble and fall.
Because Shanklin’s evidence concerning the cause of her fall fails to establish that the elevator was “misleveled” at the time of her fall or that the condition of the elevator actually caused her to fall, Shank-lin failed to present sufficient evidence of causation to overcome the summary-judgment motions on her negligence claims against NPT and Schindler. Without evidence that the elevator caused her to fall, Shanklin also failed to present sufficient evidence to overcome the summary-judg- *1258 merit motions on her wantonness claims. See Martin, 643 So.2d at 567 (“Proximate cause is an essential element of both negligence claims and wantonness claims.”). We therefore affirm the summary judgment in favor of NPT and Schindler in its entirety.[2]
AFFIRMED.
PITTMAN and BRYAN, JJ., concur.
MOORE, J., concurs in the result, without writing.
THOMPSON, P.J., dissents, with writing.

. The existence of other fictitiously named parties in Shanklin's complaint does not prevent finality of the judgment entered by the trial court. See Griffin v. Prime Healthcare Corp., 3 So.3d 892 n. 1 (Ala.Civ.App.2008).
“When there are multiple defendants and the summons (or other document to be served) and the complaint have been served on one or more, but not all, of the defendants, the plaintiff may proceed to judgment as to the defendant or defendants on whom process has been served and, if the judgment as to the defendant or defendants who have been served is final in all other respects, it shall be a final judgment.”
Rule 4(f), Ala. R. Civ. P.

. The trial court based its summary judgment on different grounds than the failure of Shanklin’s proof of causation; however, we may affirm a summary judgment on any valid ground, subject to certain limitations not applicable here. Liberty Nat’l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So.2d 1013, 1020 (Ala.2003).