922 So.2d 865 (2005)
WEBB WHEEL PRODUCTS, INC.
v.
David Joshua HANVEY.
No. 1030272.
Supreme Court of Alabama.
June 3, 2005.
Rehearing Denied August 19, 2005.
*866 Tom S. Roper of Carr, Allison, Pugh, Howard, Oliver & Sisson, P.C., Birmingham; and Robert H. Rutherford and F.A. Flowers III of Burr & Forman, LLP, Birmingham, for appellant.
J. Barton Warren of Warren & Simpson, P.C., Huntsville; and Johnny V. Berry of Berry, Berry & Little, Cullman, for appellee.

On Application for Rehearing
PER CURIAM.
The opinion of December 30, 2004, is withdrawn, and the following is substituted therefor.
David Joshua Hanvey sued Webb Wheel Products, Inc., alleging that Webb Wheel had discharged him in retaliation for his filing a claim for workers' compensation benefits. After a trial, the jury returned a verdict in favor of Hanvey, awarding $80,000 in compensatory damages and $400,000 in punitive damages. The trial court entered a judgment on the jury's verdict. After the trial court denied Webb Wheel's postjudgment motion, Webb Wheel appealed. We reverse and remand.

I.
Webb Wheel manufactures wheels, wheel hubs, brake drums, and disk-brake rotors for large trucks and trailers. It has three manufacturing plants  two in Cullman and one in Siloam Springs, Arkansas. Webb Wheel hired David Joshua Hanvey on September 19, 1999, as a production operator working on the drill press at one of the Cullman plants ("Cullman Plant # 1"). Webb Wheel employs approximately 200 people at Cullman Plant # 1.
On July 31, 2000, Hanvey suffered an on-the-job injury to his back. He reported the injury to his supervisor, Phillip Hill, and saw Webb Wheel's authorized physician, Dr. Dan Williams, who advised him not to work for one week. After a week's absence, Hanvey returned to work at his drill-press job. After about three hours, however, his back was hurting so badly that he reported it to Hill and returned to Dr. Williams, who recommended an MRI and a consultation with a neurosurgeon.
Webb Wheel self-insures its workers' compensation claims. At the time of Hanvey's injury, Alternative Insurance Resources ("AIR") was administering the paperwork required for workers' compensation claims, but all claims were paid directly by Webb Wheel, rather than by an *867 insurance company. Lynn Alward, Webb Wheel's personnel manager, was responsible for handling the workers' compensation claims for the company.
Hanvey alleges that, after his second visit to Dr. Williams, Alward told him that he could not work unless Dr. Williams released him with no restrictions. Alward consulted with Diane Ryan, the adjustor at AIR who administered workers' compensation claims for Webb Wheel, and Ryan telephoned Dr. Williams to tell him that an MRI would be authorized and that a neurological consultation could be discussed after the MRI results were received. Hanvey underwent an MRI, which revealed three bulging disks but was otherwise reported as an "essentially negative study." Webb Wheel then transferred Hanvey to another physician, who prescribed physical therapy. Hanvey was unable to work for approximately two and one-half months.
Hanvey testified that during the period in which he was temporarily disabled, he had problems receiving his workers' compensation benefits in a timely fashion. He said his checks were frequently late and sometimes for the wrong amount and that he had difficulty getting reimbursed for certain medical expenses. Because of these problems, Hanvey said, he asked Alward to allow him to pick his checks up at the plant, but she told him that the checks could not be hand delivered but had to be mailed. Alward testified that Webb Wheel's controller, Granville Hooper, told her it was against company policy for an employee to pick up his checks for workers' compensation benefits. Hooper testified, however, that he recalled no such conversation with Alward and that it would have been fine for Hanvey to pick up his checks. Hanvey testified that after his injury, Alward's attitude toward him changed; before his injury, he says, she was kind and helpful, but after his injury she was bitter and unhelpful.
Hanvey was fitted with a back brace, and he returned to work on October 18, 2000. He reported to Hill, who informed him that he would be working in a different department under a different supervisor, Byron Hale. Hanvey says that the first thing Hale said to him was that if he caught Hanvey without his back brace, he would "fire [his] ass." Hanvey was assigned to work in what the parties refer to as the "woodpile." Working in the woodpile involves stacking and repairing the wooden pallets Webb Wheel uses to ship its products. Webb Wheel personnel testified that an assignment to the woodpile is customarily temporary and that such an assignment is used to keep an employee on the job when there is no other work for the employee to do. Hanvey stated that working in the woodpile is more physically demanding than operating the drill press, but Webb Wheel employees stated that there was no work for an additional drill-press operator at the time Hanvey returned to work.
Hanvey testified that, the following day, after he had worked approximately three hours stacking pallets, his back started hurting, and he asked Hale if he could get some Tylenol brand acetaminophen for his back. Hale told Hanvey to sit down and that he would return shortly. Approximately two hours later, Hale returned with Hill. Hill and Hanvey then went to Hill's office, where, Hanvey testified, Hill stated, "[W]e're going to have to let you go because of your back." Hill denies making that statement, insisting, as noted below, that Hanvey was merely "laid off." Hanvey also testified that no one told him that he was being laid off, that the layoff was temporary, or that he later could be recalled to work. Hanvey says that after the meeting he was escorted to retrieve his *868 toolbox and then escorted to the door and watched until he got into his vehicle and left Webb Wheel's premises.
During this meeting, both Hanvey and Hill signed a form that Webb Wheel refers to as an "exit report." The form states, in part: "Reason for Termination: Dismissed ____ Lay Off ____ Quit ____." The blank beside "Lay Off" on the form signed by Hanvey is checked. The form contains a space labeled "Employee Statement," but that space on Hanvey's exit report is blank except for his signature. In the space labeled "Supervisor Comments," Hill wrote: "Josh was laid off due to lack of work. He made the statement to me that he expected to be laid off the day he came back." In the space labeled "Superintendent Comments," Dan Allen, the production superintendent of Cullman Plant # 1, wrote "Reduction in work force." In the space labeled "Manager Comments," David Link, plant manager for Webb Wheel, wrote "Questionable recall." Hill testified at trial that Hanvey was laid off because of an ongoing reduction in workforce then underway at Webb Wheel. Hill also said that he was not the person who made the decision to lay Hanvey off. Hanvey says he was not given a copy of the exit report when he signed it, and he was not permitted to obtain a copy later. As previously noted, he did sign the form, but the parties dispute how much of the form was completed when Hanvey signed it.
On October 4, 2000, two weeks before Hanvey returned to work, Webb Wheel had initiated a three-phase reduction in workforce made necessary, it says, by a downturn in business that ultimately resulted in 37 employees, including Hanvey, being laid off at Cullman Plant # 1. Exit reports like the one completed for Hanvey were completed for all 37 laid-off employees. Although Link had the primary responsibility for deciding which employees were to be laid off, the record reflects that Allen had input into the decision and that supervisors were sometimes consulted as well. Management employees testified that the layoffs were conducted pursuant to Webb Wheel's written workforce-reduction policy, which states, in pertinent part:
"In the event that a workforce reduction cannot be avoided, the following procedures apply:
"A. Volunteers are solicited from the employee group in the department in which an excess has been determined. Some may deem a layoff to be to their advantage.
"B. Employees with the least amount of company service, subject to their relative ability to perform the work are removed from the department in which the excess exists and offered other work in accordance with their previous experience, qualifications, and length of service. If no other work is available, employees are laid off based on length of service.
"C. Employees are recalled in reverse order of the reduction."
Although there was some testimony at trial to the effect that seniority is the only factor considered when layoffs become necessary at Webb Wheel, management personnel at Webb Wheel testified that in addition to seniority, an employee's skills were a factor in deciding the order in which employees were to be laid off. They also testified that layoffs could be based on a lack of work in a certain department rather than at the plant as a whole.
Webb Wheel's records indicate that for Cullman Plant # 1 as a whole, during the first phase of the workforce reduction (October 4-7, 2000), 12 employees were laid off. During the second phase (October 18-21, 2000), six employees were laid off. Of those six, two employees were laid off on October 18; Hanvey was laid off on October *869 19; two employees were laid off on October 20; and one employee was laid off on October 21. During the third phase (October 30-November 1), 19 employees were laid off. The records further indicated that 7 of the 37 employees laid off had initiated workers' compensation claims at some point during their employment.
Nineteen of the 37 laid-off employees worked in Department 116, the department in which Hanvey worked. Department 116, which produced wheels and hubs, was one of the departments hardest hit by the workforce reduction. Of the 12 employees laid off in the first phase of the workforce reduction, one had more seniority than Hanvey, but he worked in a different department and on a different crew, where he was the least senior. When Hanvey returned to work, because Department 116 was fully staffed, Hanvey was assigned to the woodpile, but he left Webb Wheel the following day. Of the six employees laid off in the second phase of the workforce reduction (the phase in which Hanvey left Webb Wheel), each, including Hanvey, was the least senior employee in his department and on his crew. When he left Webb Wheel, however, four production operators with less seniority were working on other crews in Department 116. As a general rule, Webb Wheel moved other production operators in Department 116 between crews in order to allow those employees with the most seniority to continue working. Hanvey was the only employee in Department 116 laid off out of sequence based on the seniority of the employees in the entire department.
At trial, Hanvey admitted that he knew when he returned to work after his injury that Webb Wheel was reducing its workforce because of a lack of work. He further admitted that he knew the workforce reduction had begun two weeks before he returned to work and that it continued after he was discharged. Hanvey acknowledged that 7 of the 14 employees laid off before his discharge were production operators like him and that 2 of those 14 had more seniority at Webb Wheel than he did. Hanvey also admitted that he was the least senior production operator in his department on his shift at the time he was discharged. Furthermore, Hanvey testified that even if Webb Wheel had found him another job on another shift on October 19, he would have been subject to being laid off as a result of the workforce reduction by the first of November, approximately 13 calendar days later, by which time Webb Wheel had laid off all production operators in Department 116 less senior than him, as well as at least three production operators in Department 116 more senior than him.
On January 10, 2001, Webb Wheel began recalling the employees laid off during the workforce reduction. On February 1, 2001, Hanvey sued Webb Wheel, seeking workers' compensation benefits and asserting a claim of retaliatory discharge. On March 2, 2001, Webb Wheel recalled or attempted to recall all of the remaining employees laid off in October and November 2000, including Hanvey and others who had filed workers' compensation claims. Alward testified that although she tried to reach Hanvey using several telephone numbers she had in her file for him, she was unable to contact Hanvey by telephone and that on March 9, 2001, she mailed Hanvey a certified letter notifying him of his recall. She also sent a letter to Hanvey's counsel, stating that Webb Wheel was attempting to recall Hanvey from his layoff status. Despite the fact that she wrote a letter to Hanvey's counsel, Alward testified that she did not know at that time that Hanvey had sued Webb Wheel some five weeks earlier. On March 14, Hanvey's counsel notified Webb Wheel that Hanvey would not be returning to *870 work. Hanvey testified at trial that he did not return to work because he thought he had been fired and that he no longer "trusted" Webb Wheel.
The trial court severed Hanvey's worker's compensation claim from his retaliatory-discharge claim. The parties settled the worker's compensation claim; the trial court approved the settlement and entered a final order. The case proceeded to trial on Hanvey's retaliatory-discharge claim. Webb Wheel moved for a judgment as a matter of law ("JML") at the close of Hanvey's evidence and again at the close of all the evidence on the ground that Hanvey had not presented substantial evidence of a retaliatory discharge. The trial court denied those motions. The jury returned a verdict in favor of Hanvey, awarding him $80,000 in compensatory damages and $400,000 in punitive damages.
Webb Wheel then filed a postjudgment motion for a JML, a new trial, or a remittitur, arguing that "there is no legally sufficient evidentiary basis for a reasonable jury to find for [Hanvey] on the issue of retaliatory discharge." Webb Wheel argued that Hanvey had failed to establish a prima facie case, and, in the alternative, that even if he had established a prima facie case, so as to shift the burden to Webb Wheel, Webb Wheel had had a legitimate reason for discharging him  a layoff pursuant to a workforce reduction caused by an economic downturn. Webb Wheel also argued that it was not liable for any lost wages after it attempted to recall Hanvey, that Hanvey was not entitled to recover any punitive damages because he had failed to present "clear and convincing evidence that Webb Wheel acted with oppression or malice," and that the punitive-damages award was unconstitutionally excessive. After a hearing, the trial court denied the postjudgment motion.

II.
This Court applies the same standard of review to a ruling on a motion for a JML as the trial court used in initially deciding the motion. This standard is "materially indistinguishable from the standard by which we review a summary judgment." Hathcock v. Wood, 815 So.2d 502, 506 (Ala.2001). We must decide whether substantial evidence was presented to the jury, which, when viewed in the light most favorable to Hanvey, would warrant a jury verdict in his favor. City of Birmingham v. Sutherland, 834 So.2d 755 (Ala.2002). "Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). Furthermore, "we review the record as of the time the motion for a JML was renewed at the close of all the evidence." Alabama Power Co. v. Aldridge, 854 So.2d 554, 561 (Ala.2002).

III.
As a general rule in Alabama, an employment contract for an indefinite period is terminable at will by either party, with or without cause or justification. Hoffman-La Roche, Inc. v. Campbell, 512 So.2d 725 (Ala.1987). The legislature carved out an exception to that general rule, however, with regard to a discharge of an employee subsequent to the filing of a worker's compensation claim by the employee. Section 25-5-11.1, part of Alabama's Workers' Compensation Act, provides:
"No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover *871 workers' compensation benefits under this chapter...."
This Court has articulated the following test for determining whether a plaintiff may recover under § 25-5-11.1:
"In order for an employee to establish a prima facie case of retaliatory discharge the employee must show: 1) an employment relationship, 2) an on-the-job injury, 3) knowledge on the part of the employer of the on-the-job injury, and 4) subsequent termination of employment based solely upon the employee's on-the-job injury and the filing of a workers' compensation claim."
Aldridge, 854 So.2d at 563. The plaintiff must prove "a causal connection between the workers' compensation claim and the subsequent discharge in order to establish a prima facie case" of retaliatory discharge. Id.
In the present case, it is undisputed that Hanvey proved the first three elements: He was employed by Webb Wheel; he injured his back while at work; and Hill, Allen, Link, and Alward all undisputedly knew about Hanvey's on-the-job injury. In addition, the record reflects that Hill, Allen, Link, and Alward all knew that Hanvey had filed a worker's compensation claim as a result of the injury. This case hinges, therefore, on whether Hanvey established by substantial evidence that there was a "termination of employment" within the meaning of the statute. Aldridge, 854 So.2d at 563.
Webb Wheel argues that Hanvey did not establish by substantial evidence that he was terminated; it asserts that in fact Hanvey was laid off and not terminated. See Yates v. United States Fid. & Guar. Ins. Co., 670 So.2d 908 (Ala.1995) (plaintiff who had been laid off pursuant to employer's reduction in staff did not establish prima facie case of retaliatory discharge); and G.UB.MK. Constructors v. Carson, 812 So.2d 1175 (Ala.2001) (plaintiff did not establish prima facie case of retaliatory discharge because he was laid off as part of reduction in workforce).
In considering these arguments, the trial court stated, in its order denying Webb Wheel's postjudgment motion for a JML:
"As previously stated, this Court had an opportunity at trial to consider the testimony along with the jury. Based upon all of the foregoing, the Court is persuaded that the following facts are established:
"After undergoing approximately three months of physical therapy for treatment of a work-related back injury, Josh Hanvey returned to work at Webb Wheel on October 18, 2000. Immediately upon returning to work, he was reassigned to the woodpile, a much more physical job than his previous job as a press operator. After working one full day in the woodpile, Hanvey returned to work on October 19, 2000, and began experiencing recurrent back pain. After informing his new supervisor, Byron Hale, of the back pain, Hanvey asked Mr. Hale if there were some Tylenol [brand acetaminophen] tablets he could take to alleviate his pain. In response, Byron Hale told Josh Hanvey to sit down and wait. Approximately two hours later, Byron Hale returned (without any pain medicine) and told Hanvey that he needed to attend a meeting in the office with his former supervisor, Phillip Hill. Upon entering the meeting room, Hanvey was told by Phillip Hill, `We are going to let you go because of your back.'
"No one from Webb Wheel told Hanvey that he was laid off. When Josh Hanvey attempted to obtain a copy of his paperwork he was told by his supervisor, Phil Hill, and human resource director, *872 Lynn Alward, that he was not allowed to have the documents.
"Although Webb Wheel continues to argue that Josh Hanvey was `laid off' rather than terminated, it is undisputed that the only person dismissed from Webb Wheel on October 19, 2000, was Josh Hanvey.
"Lynn Alward, the human resource director at Webb Wheel, testified in deposition, which was read to the jury, that she signed and completed a termination card on Josh Hanvey that had been initiated by Dan Allen, the production superintendent. Furthermore, Lynn Alward testified that Josh Hanvey's group health insurance termination date coincided with his termination of employment. Josh Hanvey's health insurance was terminated by Webb Wheel on October 20, 2000.
"Numerous Webb Wheel management employees testified that seniority is supposed to be the sole basis for any layoff at Webb Wheel. Webb Wheel violated [its] own procedure by skipping at least five individuals with less seniority to terminate Josh Hanvey on October 19, 2000. In fact, the skipping of seniority issue was discussed between Webb Wheel's comptroller, Granville Hooper, and Lynn Alward, the human resource director, as it pertained to Josh Hanvey. Mr. Hooper testified, `We can't skip seniority to get rid of someone.'
"This Court finds that the jury reasonably and appropriately determined that Webb Wheel's action toward Josh Hanvey on October 19, 2000, was a termination rather than a layoff."
As the trial court's order states, the trial court's conclusion that Hanvey was terminated, rather than laid off, was based on certain facts it says were "established." However, while it is clear that the trial court viewed the evidence, as it must, in the light most favorable to Hanvey, the nonmovant, Sutherland, 834 So.2d at 758, the trial court's order failed to address some crucial, undisputed facts surrounding the layoffs at Cullman Plant # 1 during the fall of 2000.
The following facts are undisputed. In the fall of 2000, Webb Wheel's manufacturing business was slowing. In order to deal with the problems created by a rapidly rising inventory, Webb Wheel management decided to shut down production at Cullman Plant # 1 for two weeks. Presumably, this was done to avoid layoffs; however, after economic conditions still did not improve, Webb Wheel ultimately determined that layoffs would be necessary. Subsequently, as part of its workforce-reduction program, Webb Wheel began laying off employees. Webb Wheel eventually laid off 37 employees, one of whom was Hanvey. All of the parties involved in the case acknowledge that, based on seniority, Hanvey was due to be laid off. All of Webb Wheel's records indicate that, on October 19, 2000, Hanvey was in fact laid off. The exit report filled out for Hanvey at that time is identical in all material respects to the exit reports filled out for the 36 other employees who were laid off during the workforce reduction. Finally, it is also undisputed that, on January 10, 2001, after business had improved, Webb Wheel began recalling the laid-off employees. Hanvey acknowledges that Webb Wheel attempted to recall him in March 2001 and that he refused to return to work at that time.
Thus, the undisputed facts at trial were as follows: (1) Webb Wheel was engaged in a bona fide layoff in October 2000 resulting from a slowdown in business; (2) Hanvey's seniority and job position made him subject to that layoff; (3) Hanvey was separated from his employment; and (4) Hanvey was subsequently recalled from *873 layoff by Webb Wheel in accordance with Webb Wheel's layoff policy.[1] In light of these facts, we conclude that, as a matter of law, there was no "termination" of Hanvey's employment and that Hanvey is accordingly precluded from recovering under the retaliatory-discharge statute, § 25-5-11.1.
The dissent accuses this Court of re-weighing the evidence, thereby ignoring a "limitation on judicial authority." 922 So.2d at 876. In fact, the Court has done nothing of the sort. Rather, we are interpreting the words in the statute according to their plain meaning, which, by all accounts, is a judicial function. See Parker v. Hilliard, 567 So.2d 1343, 1346 (Ala.1990) ("[T]he duty of a court is to ascertain the legislative intent from the language used in the enactment."). The statute we are called upon to interpret, § 25-5-11.1, states that "[n]o employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover workers' compensation benefits...." (Emphasis added.)
Hanvey argues that he was "terminated" by Webb Wheel; Webb Wheel argues that there was no "termination." Accordingly, a crucial determination we must make is what the word "terminated" means in the context in which it is used in § 25-5-11.1. "Terminate" is defined in Black's Law Dictionary 1511 (8th ed.2004), as meaning "[t]o put an end to; to bring to an end" or "[t]o end; to conclude." Black's Law Dictionary further defines "termination of employment" as "[t]he complete severance of an employer-employee relationship." 1511 (8th ed.2004) (emphasis added). Although it is the function of the jury to find the facts and, in the process, to resolve questions of disputed evidence, the undisputed evidence here establishes that Hanvey's employment was not "complete[ly] sever[ed]" on October 19, 2000, because Webb Wheel subsequently attempted to recall him in March 2001, just as it attempted to recall all of the Webb Wheel employees who were laid off during the workforce reduction, including those who had previously filed workers' compensation claims. Our holding today is consistent with the plain-language meaning of the word "terminate" as used in the retaliatory-discharge statute. Moreover, the result we reach is both reasonable and faithful to the purposes of the retaliatory-discharge statute.
There can be no doubt that by using the word "terminated" the legislature expressed an intent to protect an employee *874 from losing his or her job as a result of filing a worker's compensation action. Webb Wheel's recall letter to Hanvey makes clear that Hanvey did not lose his job except by his own choice. The dissent tries to dismiss the letter as "self-serving" and argues that the jury could choose to ignore it. This Court has a statute to interpret, however, and it cannot ignore the inescapable fact that Hanvey did not lose his job as the result of his filing a worker's compensation claim  he lost his job by refusing to return to work when he was invited to do so.
If a company is engaged in a bona fide reduction in workforce, and if an employee who has previously filed a worker's compensation claim is subject to being laid off as part of that reduction in workforce, and if that employee is separated from active employment and then recalled to active employment in accordance with the company's layoff policy, then that employee has suffered no injury as a result of his filing a claim for workers' compensation benefits. The employee would have been laid off and then recalled in the same way whether or not he had filed a worker's compensation claim; in such a situation, there is no interest for the legislature, or this Court, to protect.[2]
Of course, the rule just stated would not apply to an ad hoc layoff, unjustified by business conditions, that might target a specific individual. However, that is clearly not the case here, because it is undisputed that the Webb Wheel layoff was justified by business conditions, that it was broadly applicable to 37 employees, that Hanvey was due, based on his seniority and company policy, to be included in the programmed layoff, and that he was later recalled in accordance with company policy.[3]
The dissent states that the main opinion "impermissibly abridges Hanvey's right to trial by jury as secured by § 11, Constitution of Alabama of 1901." 922 So.2d at 876. In fact, this Court has long recognized that where a plaintiff has failed to present substantial evidence regarding some element essential to his claim or where there is no disputed issue of fact upon which reasonable persons could differ, submission of the claim to the jury is inappropriate and a JML should be entered. Brookwood Med. Ctr. v. Lindstrom, 763 So.2d 951, 952 (Ala.2000). As explained above, Hanvey failed to establish *875 that there was a "termination of employment," an essential element of a retaliatory-discharge case. Aldridge, 854 So.2d at 563. Therefore, Webb Wheel's motion for a JML should have been granted.
Moreover, this Court has previously considered retaliatory-discharge cases and found that a JML was appropriate. For example, in Aldridge, the Court considered whether an employee's termination resulted solely from that employee's filing of a worker's compensation claim. The Court set forth certain criteria that, if met by the undisputed evidence, established that the employer was entitled to a JML. 854 So.2d at 568. In this case, the issue is whether an employee was "terminated" within the meaning of § 25-5-11.1. As we did in Aldridge, we have set forth certain criteria that, if met by the undisputed evidence, establish that the employer is entitled to a JML. Webb Wheel has met these criteria. Therefore, Webb Wheel's motion for a JML should have been granted. This conclusion no more "impermissibly abridges Hanvey's right to trial by jury" than did this Court's decision in Aldridge or one of the many other cases in which we have held that a party was entitled to a JML.
The dissent also asserts that this Court has erred in concluding that, as a matter of law, Hanvey was not terminated because that conclusion is based on "inferences" impermissibly drawn in favor of Webb Wheel and such "inferences" invade the province of the jury.[4] In fact, it is not necessary to draw any "inference" in order to conclude that Hanvey's employment with Webb Wheel was not terminated, because he was in fact offered a recall from the layoff.
Moreover, none of the other three factors upon which our conclusion is based is the result of any "inference." The other three factors are also based on undisputed facts. Although we are to consider the evidence in the light most favorable to Hanvey, as the nonmovant for the JML, that fact does not require us to consider only the evidence most favorable to Hanvey while excluding undisputed evidence favorable to Webb Wheel. That undisputed evidence included evidence that Webb Wheel was engaged in a bona fide layoff in October 2001, that Hanvey's seniority and job position made him subject to that layoff, and that while Hanvey was separated from his employment he was recalled by Webb Wheel. Because of these undisputed facts, Webb Wheel's motion for a JML should have been granted.

IV.
Because we have held that Hanvey was, as a matter of law, not "terminated" within the meaning of § 25-5-11.1, the trial court erred in failing to grant Webb Wheel's postjudgment motion for a JML on that *876 basis. Accordingly, we pretermit all consideration of Webb Wheel's argument that the award of damages was excessive. The trial court's order denying Webb Wheel's motion for a JML is reversed, and the case is remanded for the trial court to enter a JML for Webb Wheel.
APPLICATION GRANTED; OPINION OF DECEMBER 30, 2004, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
NABERS, C.J., and SEE, STUART, SMITH, and BOLIN, JJ., concur.
LYONS, HARWOOD, WOODALL, and PARKER, JJ., dissent.
LYONS, Justice (dissenting).
The main opinion accurately recites long-settled principles applicable to the authority of a court in a jury case when considering a postverdict motion for a judgment as a matter of law ("JML"), stating, "We must decide whether substantial evidence was presented to the jury, which, when viewed in the light most favorable to Hanvey, would warrant a jury verdict in his favor." 922 So.2d at 870 (emphasis added). The main opinion, I respectfully submit, then ignores this limitation on judicial authority by reviewing the evidence in a light most favorable to Webb Wheel in order to reach its conclusions as to "established" facts. By so doing, the main opinion impermissibly abridges Hanvey's right to trial by jury as secured by § 11, Constitution of Alabama of 1901.
The main opinion marshals "established" facts in its effort to overcome the trial court's finding in its order denying Webb Wheel's motion for a JML "`that Webb Wheel's action toward Josh Hanvey on October 19, 2000, was a termination rather than a layoff.'" 922 So.2d at 872, quoting the trial court's order. The main opinion states:
"Thus, the undisputed facts at trial were as follows: (1) Webb Wheel was engaged in a bona fide layoff in October 2000 resulting from a slowdown in business; (2) Hanvey's seniority and job position made him subject to that layoff; (3) Hanvey was separated from his employment; and (4) Hanvey was subsequently recalled from layoff by Webb Wheel in accordance with Webb Wheel's layoff policy."
922 So.2d at 872-73 (footnote omitted; emphasis added). I have no quarrel with facts numbered (1), (2), and (3). However, only by construing the evidence in a light most favorable to the loser at trial and the movant for a JML, Webb Wheel, can one conclude that the action taken by Webb Wheel toward Hanvey on October 19, 2000, constituted a "layoff."[5] Indeed, the main opinion acknowledges that, as of October 19, 2000, Hanvey was not laid off. The main opinion states: "Although Hanvey did not explicitly urge this point to the *877 trial court or in his written briefs to this Court, an analysis of the record reveals that if Hanvey had been treated precisely like all of the other Webb Wheel employees, he likely would have worked approximately five or six additional days before being laid off." 922 So.2d at 874 n. 2 (emphasis added). Of course, Hanvey presented substantial evidence to support the view that the reason he was not treated "precisely like all of the other Webb Wheel employees" was because he had filed a worker's compensation claim, a claim that resulted in his being absent from work a total of 68 days in 2000, more than any other employee. Any failure on the part of Hanvey, as the appellee, to advance this point is not consequential because this Court can affirm a trial court's judgment for any reason supported by the record consistent with the notice requirements of due process. Hammonds v. Town of Priceville, 886 So.2d 67, 72 (Ala.2003).
The main opinion continues by noting, "The evidence indicating that Hanvey may have been treated differently from other employees, however, does not refute the undisputed evidence that he was subject to a programmed layoff and that he was later recalled." 922 So.2d at 874 n. 2. Only by ignoring substantial blocks of Hanvey's evidence, such as his testimony that he was told he was being let go "because of [his] back"[6] and his testimony that the self-serving reasons appearing on the exit report were not on that report when he signed it[7] can one conclude that on October 19, 2000, Hanvey was "subject to a programmed layoff." In addition to the aforementioned testimony of Hanvey, the main opinion either omits or overlooks the following significant evidence favorable to Hanvey: (1) evidence indicating that employees junior to Hanvey were transferred to jobs in different departments and on different shifts before they were laid off, but Hanvey was not offered the opportunity to transfer; (2) evidence indicating that Hanvey did not complain on the morning of October 19, 2000, that he could not do the job in the woodpile, nor did he ask to rest or to leave work, but merely asked his supervisor for some Tylenol brand pain medication during a break; (3) evidence indicating that in response to Hanvey's request, his supervisor, instead of giving Hanvey the medication, told him to stop work and, two hours later, took him to a meeting with Hill at which Hanvey was discharged; (4) the fact that no witness for Webb Wheel testified that, at the time of Hanvey's departure from Webb Wheel midday on October 19, 2000, there were no more pallets to be repaired and therefore no more work for Hanvey to do, thereby justifying Webb Wheel's failure to wait until the end of the day to "lay off" Hanvey; (5) evidence indicating that Webb Wheel's representatives expressed a negative attitude toward Hanvey and other employees after they had been injured and had filed workers' compensation claims; and (6) the fact that witnesses for Webb Wheel contradicted each other concerning applicable company policies, even to the point of one witness for Webb Wheel actually accusing another witness for Webb Wheel of lying.
The main opinion brushes these facts aside, stating: "[L]ike the trial court, the dissent fails to recognize that this `significant *878 evidence' does not rebut the undisputed facts that form the basis of this Court's decision that there was no `termination' within the meaning of § 25-5-11.1." 922 So.2d at 874 n. 3. Of course, the "undisputed facts" are not undisputed at all, as previously demonstrated.
Hanvey argued that he was discharged on October 19, 2000, and he presented substantial evidence to support the inference that, on that date, he was discharged, not laid off. Of course, much could have been made in the trial court of the evidence, acquiesced in by Hanvey, that, by the end of October, a few working days later, he would have been laid off as part of the workforce reduction. Specifically, Webb Wheel never argued, as would have been appropriate, that damages could not be recovered beyond November 1 because Hanvey admitted that if he had not been discharged on October 19, he would have been laid off under the reduction in workforce by November 1. Had Webb Wheel so argued, then the most the jury could have awarded Hanvey in economic damages would have been slightly more than $1,000 (two weeks' wages at $442 per week and fringe benefits for one-half month at $150). Furthermore, had Webb Wheel argued that it was not liable for damages after November 1, Hanvey's testimony concerning the degree of his mental anguish would not have supported more than a nominal award of mental-anguish damages, because almost all of that testimony related to events that occurred after November 1, when, he admitted, he would have been laid off.
The main opinion alludes to this Court's obligation to construe a statute to effectuate legislative intent. This long-standing principle is in no way in conflict with the views expressed in this dissenting opinion. The point of departure is the main opinion's insistence that "the undisputed evidence here establishes that Hanvey's employment was not `complete[ly] sever[ed]' on October 19, 2000, because Webb Wheel subsequently attempted to recall him in March 2001, just as it attempted to recall all of the Webb Wheel employees who were laid off during the workforce reduction, including those who had previously filed workers' compensation claims." 922 So.2d at 873. Elsewhere, the main opinion refers to "the undisputed evidence that he was subject to a programmed layoff and that he was later recalled." 922 So.2d at 874 n. 2. I suppose we are simply expected to draw only one inference from the evidence  that Hanvey would have been included in the recall in March 2001 even if he had not by then filed an action against Webb Wheel in which he contended that he was told on October 19 that Webb Wheel had to let him go because of his back. But, I respectfully submit, the following equally plausible inferences can be drawn from the evidence: Hanvey was indeed let go on October 19 because of his back, just as he testified; Webb Wheel did not want him back at all; had he not by the time of the recall sued Webb Wheel the company could have safely left him out of the recall; and after Hanvey sued Webb Wheel it did not dare omit him from the recall. Of course, acknowledging the existence of these competing inferences would require us to uphold the verdict in Hanvey's favor, something the main opinion does not do.
As this Court stated in Williford v. Emerton, [Ms. 1020616, March 26, 2004] ___ So.2d ___, ___ (Ala.2004):
"In considering previous appeals challenging a jury's verdict, this Court has said:
"`Upon review of a jury verdict, we presume that the verdict was correct; we review the tendencies of the evidence most favorably to the prevailing *879 party; and we indulge such reasonable inferences as the jury was free to draw from the evidence. We will not overturn a jury verdict unless the evidence against the verdict is so much more credible and convincing to the mind than the evidence supporting the verdict that it clearly indicates that the jury's verdict was wrong and unjust.'
"Campbell v. Burns, 512 So.2d 1341, 1343 (Ala.1987). Moreover, this presumption of correctness `is strengthened by the trial court's denial of the motion for a new trial.' Friendly Credit Union v. Campbell, 579 So.2d 1288, 1291 (Ala. 1991)."
(Emphasis added.) The main opinion, to be consistent with precedent, must therefore ultimately embrace the conclusion that the inferences from the evidence in favor of Hanvey are not reasonable and that the evidence against the verdict in this case is so much more credible and convincing to the mind than the evidence supporting the verdict as to render this verdict "wrong and unjust." I respectfully submit that such a conclusion is indefensible.
The main opinion insists that the result in this case is consistent with Alabama Power Co. v. Aldridge, 854 So.2d 554 (Ala. 2002), in which Alabama Power contended that it had discharged Aldridge for making a misrepresentation. This Court, reversing the trial court's order denying Alabama Power's motion for a JML, concluded that "[t]he evidence established without dispute the existence of a misrepresentation by Aldridge." 854 So.2d at 569. As the author of the majority opinion in Aldridge, I am quite familiar with its holding. In that case, Aldridge left a voice-mail message with his employer saying he needed a day off from work to make emergency repairs to his roof. A verbatim transcript of the voice-mail message was admitted into evidence without objection. Aldridge did not dispute that he made no repairs to his roof on the day he took off for that purpose. The combination of the Aldridge's own voice-mail message and the undisputed fact that he did not do what he said he was going to do left no competing evidence to weigh in a light most favorable to Aldridge, the verdict-winner. No remotely comparable record of undisputed material facts exists in this case.
I stand by the more comprehensive discussion of these issues that appeared in this opinion on original deliverance. I set forth as an appendix to this dissent that portion of the original opinion dealing with the question whether the trial court's order denying Webb Wheel's motion for a JML should be reversed. Until today, it accurately reflected the appropriate method of applying settled principles of law to appellate review of a jury verdict.
HARWOOD, WOODALL, and PARKER, JJ., concur.

APPENDIX

II. Retaliatory Discharge

As a general rule in Alabama, an employment contract for an indefinite period is terminable at will by either party, with or without cause or justification. Hoffman-La Roche, Inc. v. Campbell, 512 So.2d 725 (Ala.1987). The Legislature carved out an exception to that general rule, however, with regard to a discharge of an employee in the aftermath of the employee's filing a workers' compensation claim. Section 25-5-11.1, part of Alabama's Workers' Compensation Act, provides:
"No employee shall be terminated by an employer solely because the employee has instituted or maintained any action against the employer to recover *880 workers' compensation benefits under this chapter...."
We first address Webb Wheel's argument that Hanvey did not prove the elements of a retaliatory discharge.

A. Standard of Review

This Court applies the same standard of review to a ruling on a motion for a JML as the trial court used in initially deciding the motion. This standard is "materially indistinguishable from the standard by which we review a summary judgment." Hathcock v. Wood, 815 So.2d 502, 506 (Ala. 2001). We must decide whether substantial evidence was presented to the jury, which, when viewed in the light most favorable to Hanvey, would warrant a jury verdict in his favor. City of Birmingham v. Sutherland, 834 So.2d 755 (Ala.2002). "Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). Furthermore, "we review the record as of the time the motion for a JML was renewed at the close of all the evidence." Alabama Power Co. v. Aldridge, 854 So.2d 554, 561 (Ala. 2002).

B. Prima Facie Case

In Aldridge, we clarified the rule that "[a] plaintiff must prove a causal connection between the workers' compensation claim and the subsequent discharge in order to establish a prima facie case." 854 So.2d at 563. We then reiterated the elements that a plaintiff must prove to establish a prima facie case of retaliatory discharge:
"In order for an employee to establish a prima facie case of retaliatory discharge the employee must show: 1) an employment relationship, 2) an on-the-job injury, 3) knowledge on the part of the employer of the on-the-job injury, and 4) subsequent termination of employment based solely upon the employee's on-the-job injury and the filing of a workers' compensation claim."
854 So.2d at 563.
It is undisputed that Hanvey proved the first three elements: He was employed by Webb Wheel, he injured his back at work, and Hill, Allen, Link, and Alward all undisputedly knew about the on-the-job injury. In addition, the record reflects that Hill, Allen, Link, and Alward all knew that Hanvey had filed a workers' compensation claim as a result of the injury. Webb Wheel argues that it was entitled to a JML because, it argues, Hanvey did not prove that he was discharged solely because he filed a claim for workers' compensation benefits, relying on that portion of Aldridge in which we stated that "where a conclusive determination can be made that retaliation is not the sole basis for the discharge a judgment as a matter of law is appropriate." 854 So.2d at 568. In the succeeding sections of this opinion, we address the evidence presented of the components of such a determination.

C. Discharge or Layoff

Section 25-5-11.1, Ala.Code 1975 ("No employee shall be terminated by an employer solely because the employee has instituted ... any action ... to recover workers' compensation benefits ....") deals only with a retaliatory discharge, not merely a layoff. (Emphasis added.) Webb Wheel insists that Hanvey was not discharged because, it argues, the evidence conclusively established that Hanvey was laid off while Webb Wheel was engaged in a workforce reduction that resulted in the layoffs of 37 employees, including Hanvey. Webb Wheel maintains that the evidence showed that it initiated the workforce reduction *881 because of an economic downturn, that Hanvey's department was one of the hardest hit, that other employees with more seniority than Hanvey were also laid off during the workforce reduction, and that it tried to recall all of the laid-off employees, including Hanvey, to return to work after the layoffs ended. Therefore, Webb Wheel concludes, Hanvey has not established a prima facie case of retaliatory discharge, citing Yates v. United States Fidelity & Guaranty Insurance Co., 670 So.2d 908 (Ala.1995) (plaintiff who had been laid off pursuant to employer's reduction in staff did not establish prima facie case of retaliatory discharge); G.UB.MK. Constructors v. Carson, 812 So.2d 1175 (Ala.2001) (plaintiff did not establish prima facie case of retaliatory discharge because he was laid off in reduction of workforce); Kent Corp. v. Hale, 699 So.2d 954 (Ala. 1997) (plaintiff did not establish essential element of having been discharged because he made decision to discontinue working for employer).
Hanvey argues that Webb Wheel is not entitled to a JML because, he says, the facts are disputed as to whether Webb Wheel laid him off or discharged him on October 19. Hanvey emphasizes that on his first day back at work after he injured his back at work he was not allowed to return to his drill-press job, he was assigned to a more strenuous job in the woodpile, and he was assigned a new supervisor, Hale, who informed him that he would be fired if he did not wear his back brace. The next day, Hanvey says that after he asked for pain medication for his back, Hale left him waiting for two hours and then returned with Hill. Hanvey then met with Hill, who, Hanvey says, told him that Webb Wheel had to "let him go because of [his] back"; according to Hanvey, Hill did not say anything to him about his being laid off. It is undisputed that Hanvey was the only employee whose employment ended on October 19 and that his employment ended less than three months after he was injured and instituted his workers' compensation claim. Hanvey argues that all of the foregoing establishes that Webb Wheel did not, in fact, lay him off but instead discharged him.
A review of the record reflects that the evidence concerning the critical issue of what happened in the meeting between Hill and Hanvey is far from clear. Hill disputes Hanvey's account of what was said in the meeting. In addition, both Hill and Hanvey provided contradictory testimony concerning what information was included on the exit report at the time Hanvey signed it.
During his direct examination, Hanvey testified:
"Q. Where did Phil Hill take you?
"A. To his office.
"Q. Did you go up there with him?
"A. Yes, sir.
"Q. Was anybody else in the room with the two of you?
"A. No, sir.
"Q. What happened in the room?
"A. He told me they were having to let me go because of my back.
"Q. What did you say to him?
"A. I told him I expected that.
"Q. Why did you expect it? Why did you tell him you expected that?
"A. All the trouble I was having trying to get my checks and get my bills paid.
"....
"Q. Now, when Phil Hill told you that they were going to let you go because of your back, did he tell you at any time during that conversation, Josh, we have got an economic downturn, *882 our profits aren't good, our orders aren't good, our warehouse is full of stock, did anything like that come up in the conversation?
"A. No, sir.
"Q. When Phillip Hill told you that they were letting you go because of your back, did he tell you, Josh, this is only going to be temporary, as soon as orders pick right back up we'll get you right back in?
"A. No, sir.
"Q. When he told you that about letting you go because of your back, did he say, Josh, you need to get back in to see the doctor, let me know and I'll get that lined up with Ms. Alward or Granville Hooper or whoever is going to do it, did anything like that ever come up?
"A. No, sir.
"Q. When he made that comment to you and told you they were going to let you go, did he give you a piece of paper that he wanted you to sign, an exit report where you would put your name on it?
"A. Yes, sir.
"Q. We have a blowup of this somewhere that everybody knows what we are talking about. Mr. Hanvey, when you signed it, on Exhibit 15, was there any writing below your signature?

"A. I don't remember anything.

"Q. It was just this information up top?

"A. Yes, this.

"Q. Your name on the left and then over on the right side the date, hire date, term date, clock number, department number and crew?

"A. Yes, sir.

"Q. This other material in the middle[[1]] and below your signature, was that filled out after you signed it to your recollection?

"A. After I signed it?

"Q. Yes, by someone else?

"A. Yes, sir.

"Q. Is any of this your handwriting?
"A. No, sir.
"Q. All right. Were you given any of this paperwork?
"A. No, sir.
"Q. Did you ask for it?
"A. Yes, sir.
"Q. Who did you ask for?
"A. The first time Phillip Hill.
"Q. What did he tell you?
"A. He told me I didn't need a copy.

*883 "Q. Did you ask anybody else for the paperwork?
"A. I went to my sister's house and called Lynn Alward and asked for a copy of it.
"Q. And what did she tell you?
"A. She told me I couldn't have one and hung the phone up."
(Emphasis added.) Under cross-examination by Webb Wheel, however, Hanvey appears to contradict the above testimony. Adding to the confusion is the fact that it is difficult when reading the cross-examination to determine when Webb Wheel's lawyer is asking Hanvey questions at the trial and when he and Hanvey are reading from Hanvey's pretrial deposition. The following occurred during Hanvey's testimony:
"Q. I asked you a minute ago if you had seen the layoff policy, you said you had seen it but never read it. Assume for me, if you will, that your layoff was actually a layoff. Can you look at this policy and tell me how your layoff didn't comply with it? And I will give you a copy as soon as I can lay my hands on it.
"Let me show you what's been marked as Defendant's Exhibit 21 and it's a letter-size version of this policy. And again, I was asking you if you would assume for me, if you will, that your layoff, what you call a termination, was actually a layoff. Can you look at that policy and tell me why it didn't comply [with] that policy?
"A. Could you ask that again?
"Q. Sure. Assuming that October 19 was actually a layoff for you, how did it not comply with this policy?
"A. I wasn't told that I was laid off.
"Q. You weren't told you were laid off?
"A. No, sir.
"Q. Well now, the form that you signed said laid off due to lack of work, didn't it? Isn't that your exit report?
"A. Yes, sir.
"Q. Doesn't it say Josh Hanvey was laid off due to lack of work?
"A. Yes, sir.
"Q. That was on there when you signed it, wasn't it?

"A. I don't know if it was or not.

"Q. We'll come back to that. But assuming that was on there when you signed it, you were told you were being laid off due to lack of work, weren't you?
"A. No, sir.
"Q. Isn't that what it says?
"A. It's what it says.
"....
"Q. Now, when Phil Hill supposedly told you we are going to have to let you go because of your back, you didn't have anything to say to that?
"A. I expected it.
"Q. And that's what was written on the sheet, you told him you expected to be laid off the day you came back?
"A. Yes, sir.
"Q. But you weren't laid off the day you came back, you were laid off [the] following day, right?
"A. I wasn't laid off.
"Q. October 19 was the date that you left Webb with your story of Phillip Hill having said we're letting you go because of your back?
"A. Yes, sir.
"Q. That was the second day after you returned to work?
"A. Yes, sir.
"Q. I would like to go back to Defendant's Exhibit 1A. This is the sheet that was filled out when Phillip Hill took you up to the office, right?

*884 "A. Yes, sir.
"Q. That's your signature?
"A. Yes, sir.
"Q. That's the date?
"A. Yes, sir.
"Q. And it says Josh was laid off due to lack of work. He made the statement to me that he expected to be laid off the day he came back. Signed, Phillip Hill. The same day?
"A. Yes.
"Q. That was there when you signed it, wasn't it?

"A. I don't know if it was or not.

"Q. You don't remember it?

"A. No, sir.

"Q. Do you recall giving a deposition in this case, Mr. Hanvey?
"A. Yes, sir.
"Q. I was there asking you questions?
"A. Yes, sir.
"Q. And your lawyer was there?
"A. Yes, sir.
"Q. Do you recall me asking you in that deposition whether Phillip Hill's comments were written on that form that you signed?
"A. Yes, sir.
"Q. Do you recall what you told me at that time?
"A. No, sir.
"Q. If you would, let's go to page 185. We just finished talking about what you said Phil said. I said question: You said you were going to be let go because of your back? Read your answer, please, sir?
"A. Yes.
"Q. All right, did he say  use the word layoff at any time?
"A. No.
"Q. Did you ask him why layoff was checked on here on Defendant's Exhibit 2?
"A. No.
"Q. Okay, but it was checked off when you signed it, wasn't it?
"A. I don't remember.
"Q. You don't remember?
"A. I don't remember.
"Q. Continue please.
"A. I remember him filling out this part and just right here.

"Q. And there's an interjection by your lawyer every time about the address and Social Security number at the top, right?

"A. Yes, sir.
"Q. You said, the witness, that would be you.
"A. The hire day, termination date. I remember that being on there and this comment that he put down here, I remember that.

"Q. This comment that he put down here, Josh was laid off due to lack of work. He made the statement to me that he expected to be laid off the day he came back. Isn't that what we are talking about?

"A. Yes.

"Q. And I said okay. And you said?
"A. None of this stuff I remember.
"Q. This stuff would be Dan Allen's comments; is that right? I didn't ask you that, I'm asking what you were referring to when you said none of this stuff.
"A. I don't know.
"Q. Question: Okay, you don't remember whether or not the layoff section was checked or not?

"A. No.

"Q. Okay, it could have been, might not have been?

*885 "A. I don't know.

"Q. Let's go to page 187. And my question was: Okay, when you signed it his comment was written here already? What was your answer?

"A. Yes.

"Q. All right, would you read his comment for me? And what was your answer?
"A. Joshua was laid off due to lack of work. He made the statement to me that he expected to be laid off the day he came back.
"Q. Okay. So then that was on there when you signed it?

"A. Yes.

"Q. It says you were laid off due to lack of work?
"A. Yes.
"Q. Okay, did you ask him about that?
"A. No.
"Q. Did you ask him any questions?
"A. No.
"Q. Mr. Hanvey, does that refresh your memory about whether or not 
"....
"Q. Mr. Hanvey, after looking back at your testimony [in] deposition when Phillip Hill sat there yesterday and said that your comment  his comment was on here when you signed it, he was right, wasn't he?

"A. Yes, sir.

"Q. And despite that deposition, you testified yesterday that it wasn't on there, isn't that right?

"A. I said if it was then I don't remember it.

"Q. Now, the statement written on Defendant's 1A, the layoff sheet, doesn't say anything about your back, does it?
"A. Do what?
"Q. It doesn't say anything about your back, does it?
"A. No, sir.
"Q. Doesn't say anything about being let go?
"A. No, sir.
"Q. The layoff box is checked up here?
"A. Yes, sir.
"Q. Mr. Hanvey, isn't it true you signed the form because you knew it was a layoff?
"A. No, sir.
"Q. Isn't it true that the reason you said I expected to be laid off the day I came back was because you already knew there were layoffs going on?
"A. No, sir.
"Q. So it would be your position that when Phillip Hill wrote Joshua was laid off due to lack of work that that's just a lie?
"A. Sir?
"Q. Would it be your position that when Phil Hill wrote Joshua was laid off due to lack of work that that was a lie?

"A. Yes, sir.

"Q. And you signed off on it?
"A. Yes, sir."
(Emphasis added.) Hill's testimony on direct examination, cross-examination, and deposition is also contradictory. Upon questioning at trial by Webb Wheel's lawyer, Hill testified:
"Q. Let's go through this [Hanvey's exit report] together. There are three spaces here, the middle one is checked, what does that say?
"A. Layoff.
"Q. And what are the two that are not checked?
"A. Dismissed and quit.
"Q. Let's see what else is on here. These other checks below there they *886 say supervisor responsibility, did you make those marks?
"A. Yes.
"Q. What did that indicate?
"A. If he had any uniforms, tools, keys, any advances or any kind of miscellaneous. Everything was checked off and turned in.
"Q. Go down to where it says supervisor comments. Would you read that to the jury?
"A. Josh was laid off due to lack of work. He made the statement to me that he expected to be laid off the day he came back.
"Q. And that's your signature below?
"A. Yes.
"Q. Dated October 19?
"A. Yes.
"Q. And that's your handwriting?
"A. Yes.
"Q. And above that, is that Josh Hanvey's signature?
"A. Yes.
"Q. Did he sign there after you wrote those supervisor comments?

"A. I think he did.

"Q. Did he say anything to you at the time you filled out this document other than what you wrote there about his statement?
"A. No.
"....
"Q. Just a moment. Did you ever tell Josh Hanvey he was being let go because of his back?
"A. No, I did not say that.
"Q. Did David Link or Dan Allen tell you that?
"A. No."
(Emphasis added.) Upon questioning by Hanvey's lawyer, Hill testified:
"Q. Let me start over. Josh's signature here, your comments below, did you write in your comments before he signed or after he signed it?

"A. I think I wrote it after he signed it.

"Q. All right, so he signs it, gives it to you and then when he is gone, you fill it in?
"A. No, I fill it out and give him an opportunity to write any kind of statement on it that he wants to write.
"Q. I'm not with you. I'm wanting to know, did Josh sign this with this written on it?

"A. Yes, I think he did. The best I can remember he did.

"Q. Back to your deposition, page 40. Question that actually started on 39: The comment that you wrote here, Joshua was laid off due to lack of work. He made the statement to me that he expected to be laid off the day he came back, what did you make of that? You answered: I thought it was strange that he told me that, I don't know. Question: Did you ask him what he meant by that? You answered: No. Question: Is that exactly word for word what he told you or is that just your summary of it? You answered: No, that was word for word. Question: Now, did you write in your comments after or before Josh Hanvey signed this? And you answered: I think I wrote that after.

"A. I may have.

"Q. Well, it's a big difference, sir, isn't it?
"A. The deposition, I hadn't even  I had thought more about it since then. I think I wrote that before.

"Q. Mr. Hill, you have not notified anyone that your memory has changed until you have come here to testify in this court, have you, sir?

*887 "A. No."
(Emphasis added.)
It is axiomatic that it is the jury's province to resolve conflicts in testimony, Wright v. Mills, 590 So.2d 177 (Ala.1991), and to judge the credibility of witnesses, Floyd v. Broughton, 664 So.2d 897 (Ala. 1995). If the jury concluded that Hill was willfully not truthful about one material aspect of his testimony, then it was free to disregard all or any part of his testimony. See Franklin v. Cannon, 565 So.2d 119, 121 (Ala.1990). The trial court charged the jury as follows:
"When a witness takes the witness stand that witness puts his or her credibility in issue in the case and you, the jury, may say whether you will believe that witness or whether you will believe a part of the testimony of that witness. You are the sole and exclusive judges as to the weight that should be given the testimony in the case. If you are reasonably satisfied that a witness has willfully testified falsely about a material fact, you may choose in your discretion to disregard the witness's testimony in its entirety. You may accept or reject any part of the testimony of any witness and you should accept only the testimony you consider worthy of belief. In determining the weight to be afforded the testimony of any witness, you may consider the demeanor of the witness while on the witness stand, his apparent candor or evasion or the existence or nonexistence of any biased [sic] or interest that the witness may have."
It is likewise the jury's province to resolve conflicts or contradictions in a witness's own testimony. In Semmes Nurseries, Inc. v. McVay, 279 Ala. 42, 45, 181 So.2d 331, 333 (1965), this Court stated:
"The fact that a plaintiff makes contradictory statements, in his own case, does not justify the court in directing the verdict against the plaintiff. Which version of plaintiff's testimony should be believed is a question for the jury, although the fact that his testimony is conflicting could be considered by the jury in weighing the testimony and treated as a circumstance against him."
(Emphasis added.) See also Dearmon v. Dearmon, 492 So.2d 1004, 1007 (Ala.1986), in which this Court stated:
"The fact that a party offers contradictory testimony does not render his testimony unbelievable as a matter of law. Contradictions in testimony may diminish a party's credibility, but the truthfulness of the testimony is an issue to be resolved by the trier of fact."
(Citation omitted.) If the jury believed that Hill told Hanvey that he was being "let go" instead of "laid off," then the jury could have concluded that Hanvey indeed had been discharged from his employment. If Hill wrote the comments that appear on the exit form after Hanvey signed it, then the jury could have concluded that Hanvey had been discharged and that the subsequent writings were an attempt to alter the record after the fact to show something different than that which actually occurred. In sum, the jury had before it substantial evidence indicating that Hanvey was discharged and not merely laid off, and its verdict reflects its obvious conclusion that that was indeed the case.

D. Causal Connection

Circumstantial evidence of a causal connection between a workers' compensation claim and an employee's discharge is appropriate in retaliatory-discharge actions. Culbreth v. Woodham Plumbing Co., 599 So.2d 1120 (Ala.1992). This Court identified in Aldridge certain factors that can be considered as circumstantial evidence of a causal connection between an employee's *888 filing a workers' compensation claim and that employee's discharge:
"`1) knowledge of the compensation claim by those making the decision on termination, 2) expression of a negative attitude toward the employee's injured condition, 3) failure to adhere to established company policy, 4) discriminatory treatment in comparison to similarly situated employees, 5) sudden changes in an employee's work performance evaluations following a workers' compensation claim, and 6) evidence that the stated reason for the discharge was false.'"
854 So.2d at 564-65 (quoting Chhim v. University of Houston, 76 S.W.3d 210, 218 (Tex.Ct.App.2002)). Furthermore, we observed that "[m]any states also consider `[p]roximity in time between the filing of the workers' compensation claim and discharge' a persuasive factor in establishing a causal connection." Aldridge, 854 So.2d at 565 (quoting Rebarchek v. Farmers Coop. Elevator & Mercantile Ass'n, 272 Kan. 546, 555, 35 P.3d 892, 899 (2001)).
Several of the foregoing elements are present in this case. Hanvey was injured on July 31, 2000, filed a worker's compensation claim shortly thereafter, and was not able to work for two and one-half months. He returned to work on October 18 and was discharged the next day, October 19, 2000, his second day back at work, after he asked his supervisor for some Tylenol brand pain medication for his back pain. Hanvey did not ask to leave work or to rest; he did not complain that he could not do the job in the woodpile. He merely asked for over-the-counter pain medication.
As previously stated, it is undisputed that the decision-maker or makers in this case knew the Hanvey was injured and that he had filed a claim for workers' compensation benefits. Some of Webb Wheel's witnesses testified that Link was the sole decision-maker. Link testified that he knew Hanvey had suffered a back injury that was work-related. Link explained in his testimony, however, that Allen and individual supervisors such as Hill were involved in selecting particular employees to be laid off during the workforce reduction. Allen and Hill were also clearly aware that Hanvey had been injured, that he had received workers' compensation benefits, and that he had just returned to work.
Hanvey contends that Webb Wheel's representatives expressed a negative attitude toward him and other employees after they were injured and had filed workers' compensation claims. Although Webb Wheel argues to the contrary, the record reflects that Hanvey presented substantial evidence from which the jury could have concluded that Webb Wheel had such a negative attitude toward injured workers. We note that according to the injury log required to be kept by the federal Occupational Safety and Health Administration ("OSHA"), Hanvey was absent from work a total of 68 days in 2000, more than any other employee.
Hanvey first points to comments such as the one made by Hale, whose first words when Hanvey reported to the woodpile were that Hanvey's "ass" would be fired if Hale caught him without his back brace. That comment is not disputed, but Webb Wheel argues that although the comment was crude, Hale was simply trying to impress upon Hanvey the importance of wearing the back brace to guard against further injury to his back.
Hanvey next argues that his assignment to the woodpile was itself an expression of a negative attitude toward him. He described the woodpile job as being more strenuous than his drill-press operator job. Webb Wheel argues, however, that Hanvey's *889 assignment to the woodpile was not any kind of punishment. Witnesses for Webb Wheel described the woodpile as a temporary job assignment used to keep employees working when there was a lack of work or when an employee had returned to work during a workforce reduction and there was nothing else for him to do. Webb Wheel contends that when Hanvey returned to the job site, there was no work for him in his regular department as a drill-press operator and the assignment to the woodpile was an effort to find something for him to do and to avoid laying him off. Webb Wheel witnesses testified that every employee is subject to repairing pallets if he cannot perform his job or is not needed for a time in his permanent job assignment, and that almost all of the employees at Webb Wheel had worked in the woodpile at one time. Hanvey presented the testimony of two former employees of Webb Wheel who testified that they had never been assigned to the woodpile.
Hanvey next argues that Alward exemplified Webb Wheel's negative attitude toward its injured employees. Hanvey and two other former employees of Webb Wheel testified that when they were first hired, Alward was kind and helpful toward them, but each testified that after he was injured, her demeanor toward him changed and she was bitter and negative. They described Alward as having made the injured employee feel like he had gotten hurt "on purpose." Hanvey complains that in addition to her negative attitude toward him, she interfered with his medical treatment by refusing to authorize his consultation with a neurosurgeon recommended by Dr. Williams, the initial treating physician to whom Webb Wheel directed Hanvey. Webb Wheel argues that Alward's alleged involvement in Hanvey's medical treatment cannot be evidence of its hostility toward him because she was not involved in the decision to end his employment.
Finally, Hanvey argues that the difficulty he experienced in getting reimbursed for medical expenses and in receiving his temporary disability benefits on time is evidence of Webb Wheel's negative attitude toward him. He testified that he asked Alward whether he could pick up his worker's compensation checks at the plant instead of having them mailed to him and that Alward told him that the company policy prohibited him from picking up his checks. Alward insisted that the company had such a policy. She testified:
"Q. Why can't you get a [workers'] comp. check at work?
"A. I don't make that policy. That would be Mr. Hooper.
"Q. They would have to wait on you to mail it if you are drawing comp?
"A. That's correct.
"Q. And Josh told you many times that his checks were not coming on time, true?
"A. He did mention that, yes.
"Q. Did you go to Mr. Hooper over in the accounting department and ask him can we make an exception for this young man, he's hurt his back and let him come to the plant to get his check?
"A. I do believe I asked that, yes.
"Q. And what did he tell you?
"A. He told me that it was company policy that checks are mailed.
"Q. He said no, correct?
"A. He said checks are mailed, yes.
"Q. You do remember talking to Mr. Hooper about that?
"A. Yes, I do."
Webb Wheel argues that it was not punishing Hanvey by allegedly not paying his *890 temporary disability and certain medical expenses in a timely fashion. Webb Wheel insists that the evidence was undisputed that Webb Wheel had a strict policy of mailing checks rather than allowing employees to pick them up. However, Hooper testified:
"Q. Is there a policy that you have set at Webb Wheel about when and where employees are allowed to pick up worker's compensation checks?
"A. No, sir. Those checks come in and my accounts payable people would come in there, either myself of my assistant signs them and they are put in the mail and sent out to the employees.
"Q. Have you ever told any managers or coworkers that you have a policy that you have at Webb Wheel that no worker is allowed on the plant to pick up personally their worker's comp. check?
"A. No, sir.
"....
"Q. Did Lynn Alward ever call you to ask you would it be okay if Josh Hanvey could come by and pick up his check for [sic] worker's comp. check benefits because he's moved and we don't have a forwarding address? Did she ever call and ask you that?
"A. I don't recall that ever happening.
"Q. If she had made that call to you and said would it be okay if Josh comes by and just hand picks up his check, would you have okayed it?
"A. Yes, sir."
Nevertheless, when she was called as a rebuttal witness, Alward insisted that Webb Wheel had such a policy. She testified:
"Q. ... And you recall when you were here earlier and you were asked about this policy of not letting injured workers come to Webb Wheel to pick up checks?
"A. Yes, that's correct.
"Q. And if I understood, your testimony was that Mr. Hooper had implemented a policy preventing injured workers coming to the plant to pick up checks?
"A. Yes, that's correct.
"Q. Mr. Hooper testified before the jury and his statement, his testimony was that there wasn't such a policy and my question to you is, is your recollection on that firm?
"A. It is firm as I stated in my previous testimony, yes.
"Q. As you recall it, there was a policy?
"A. As I recall it, there was a policy that checks could not be picked up, they had to be mailed.
"Q. And it was Mr. Hooper's policy?
"A. Yes, sir, that's correct.
"Q. And the fact that Mr. Hooper might have said something different doesn't change your mind?
"A. No, sir, it doesn't.
"Q. Do you think Mr. Hooper was lying?
"A. I couldn't answer for Mr. Hooper. I can just testify to what I recall.
"Q. How long ago was it that this issue came up and this issue of the policy came up?
"A. Regarding Mr. Hanvey?
"Q. Yes.
"A. It would have been during the time he was coming in to pick up his worker's comp checks.
"Q. In the fall of 2000?
"A. Yes, that's correct.
"Q. That would be about three years ago?
"A. Yes, exactly.

*891 "Q. Is it possible in your mind that Mr. Hooper is mistaken?
"A. In my mind, yes.
"Q. Do you believe you could be mistaken?
"A. Possibly yes, but I feel that what I have stated is accurate.
"Q. That's the way you recall it?
"A. That's the way I recall it.
"Q. One of you has to be wrong but that's the way you recall it?
"A. Yes, one of us is possibly wrong. But I recall as I stated."
Alward's testimony was challenged in other aspects as well. For example, she also testified on rebuttal that Hanvey telephoned her in May 2001, approximately two months after Webb Wheel had tried to recall him. Alward stated:
"He called inquiring if Webb was hiring and if we would rehire him. I told him that applications were being accepted in our main lobby and that he was more than welcome to come in and complete an employment application. At that time he asked how he could get his job back and I told him that it was my understanding that he had an attorney and other than telling him that he was welcome to come in and complete an employment application, I really couldn't discuss anything else with him. At that point he said if I fire my attorney, can I get my job back. Here again, I told him that since there was an attorney involved, I could not discuss that with him."
Hanvey's attorney recalled him to testify, and he flatly denied that he had ever had such a conversation with Alward or that he had ever talked to her after October 19 other than to ask her to complete a credit life insurance form shortly after he was discharged.
As previously noted, the trial court charged the jury that it was to determine the weight to give testimony in the case. If the jury concluded that Alward was willfully not truthful about one material aspect of her testimony, then it was free to disregard all or any part of her testimony.
Additionally, Hanvey argues that Webb Wheel failed to adhere to its workforce-reduction policy. Alward testified emphatically that seniority was the sole basis for determining the order in which employees were to be laid off during a reduction in workforce. Link and Hill, however, testified that an employee's job skills and the nature of the department in which he worked also were factors in determining the layoff order. Hanvey argues that other employees junior to him were offered jobs in different departments and on different shifts before they were laid off and that he should have been offered similar accommodations. He testified that he would have transferred back to the night shift from the day shift in order to keep his job, but that he was never offered such a transfer. Reviewing the seniority list and comparing it to the dates on which employees were laid off, it is clear that transfers were offered to other employees of Department 116 who had less seniority than Hanvey, and, therefore, that Webb Wheel did not follow its workforce-reduction policy. Hanvey did admit, however, that even if he had been able to return to his job as a drill-press operator on October 18, albeit on a different shift or crew, he would have been subject to the workforce reduction by the first of November.
"Q. You don't dispute that even if they had moved you to another job on another shift that it would have been appropriate to lay you off 10 or 11 days later when they reached all these people with much more seniority than you, you don't dispute that, do you?

*892 "A. No, sir."
We conclude that in light of the foregoing, Webb Wheel was not entitled to a JML. As we stated in Aldridge:
"An employer's stated basis for a discharge is sufficient as a matter of law when the underlying facts surrounding the stated basis for the discharge are undisputed and there is no substantial evidence indicating (a) that the stated basis has been applied in a discriminatory manner to employees who have filed workers' compensation claims, (b) that the stated basis conflicts with express company policy on grounds for discharge, or (c) that the employer has disavowed the stated reason or has otherwise acknowledged its pretextual status."
854 So.2d at 568. The underlying facts surrounding Webb Wheel's stated basis for Hanvey's discharge  that it laid him off pursuant to a valid workforce reduction  are clearly disputed as of October 19, the day on which Hanvey was either "let go" or laid off. Furthermore, Hanvey presented substantial evidence indicating that his purported layoff by Webb Wheel conflicted with the company's express workforce-reduction policy.

E. Pretext

We now turn to the question whether a conclusive determination can be made in this case as to sole causation. After a defendant has presented legitimate reasons for his discharge, "`"[t]he plaintiff then has the burden of going forward with rebuttal evidence showing that the defendant's [stated] reasons"' for [discharging] the plaintiff are not true." Culbreth, supra, 599 So.2d at 1122, quoting Twilley v. Daubert Coated Prods., Inc., 536 So.2d 1364, 1369 (Ala.1988), quoting in turn Pushkin v. Regents of the Univ. of Colorado, 658 F.2d 1372, 1387 (10th Cir.1981). In answering that question, "we review the entire record, not merely the evidence as it stood at the time [Webb Wheel] first moved for a JML." Aldridge, 854 So.2d at 568.
Webb Wheel argues that Hanvey has not produced any evidence indicating that Webb Wheel's stated reason for the discharge (that it laid him off pursuant to a workforce reduction) was pretextual, citing Bullion v. JMBL, Inc., 657 So.2d 834 (Ala. 1995) (because employer presented evidence that it laid off plaintiff, burden shifted to plaintiff to show by substantial evidence that employer's stated basis was pretextual); Graham v. Shoals Distrib., Inc., 630 So.2d 417, 419-20 (Ala.1993) (employer's decision to lay off employee is legitimate, nonretaliatory reason for its action). Webb Wheel insists that by presenting evidence of its legitimate reason for laying Hanvey off, it has rebutted any inference of retaliation raised by Hanvey's initial showing. Webb Wheel further argues that any evidence offered by Hanvey to rebut its stated basis for his layoff is based upon conjecture and is thus insufficient to create a fact question for the jury.
We disagree. As previously noted, despite Webb Wheel's characterization of its treatment of Hanvey as a layoff, the jury had before it evidence that as of October 19, Webb Wheel discharged Hanvey. In addition to the foregoing evidence, the jury also could have considered the two-hour delay between Hanvey's request for pain medication, when Hale told him to sit down and wait until he returned, and the meeting with Hill in which Hanvey was either told he was laid off or let go before he had finished his shift. Viewing the evidence in a light most favorable to Hanvey, the nonmovant, as we are required to do, Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143 (Ala. *893 2003), including evidence of the status of the exit report when Hanvey signed it, Hill's use of the phrase "let go" is inconsistent with an employee's merely being laid off. Furthermore, there is no testimony indicating that there were no more pallets to be repaired and therefore no more work for Hanvey to do so that a layoff was called for before the end of the day. Additionally, Link testified that the decision to lay off Hanvey was made on the morning of October 19. The jury could have inferred from the two-hour delay that Link was consulted and that he instructed Hill to go ahead and discharge Hanvey before he would have been subject to being laid off as a result of the reduction in workforce. We cannot say as a matter of law, without impermissibly reweighing the evidence, that the jury could not have concluded that Webb Wheel's stated reason for Hanvey's discharge was pretextual. Consequently, Webb Wheel was not entitled to a JML, and the trial court properly denied its postjudgment motion on that basis.
NOTES
[1] Of these four facts, the dissent agrees with the first three. The dissent disagrees with the conclusion that it is undisputed that "Hanvey was subsequently recalled from layoff by Webb Wheel...." The offer made to Hanvey in March 2001 could only have been (1) an offer of new employment; or (2) a recall from layoff. There is no substantial evidence that would indicate that the offer was one of new employment. In fact, it is undisputed, indeed Hanvey acknowledged, that he received a letter from Webb Wheel attempting to recall him to active employment:

"Q: You did get the letter saying we are trying to recall you, didn't you?
"A: The certified letter?
"Q: Yes.
"A: Yes, sir."
The certified letter in its entirety read:
"Webb Wheel Products, Inc. is recalling employees from lay-off[;] you are being recalled to the same job as Production Operator on Crew `A.'
"Please contact my office to schedule an appointment for the return to work physical."
However the dissent may try to describe it, this offer is undisputedly one made to Hanvey of recall from layoff, which, had he accepted the offer, would have resulted in Hanvey's returning to his job in the same way as every other Webb Wheel employee returning from layoff.
[2] Although Hanvey did not explicitly urge this point to the trial court or in his written briefs to this Court, an analysis of the record reveals that if Hanvey had been treated precisely like all of the other Webb Wheel employees, he likely would have worked approximately five or six additional workdays before being laid off. The evidence indicating that Hanvey may have been treated differently from other employees, however, does not refute the undisputed evidence that he was subject to a programmed layoff and that he was later recalled. The unambiguous intent of the legislature in enacting § 25-5-11.1 was to prevent an employee from being terminated solely because that employee filed a claim seeking workers' compensation benefits. The legislature could have enacted a statute prohibiting all types of disparate treatment of an employee who has filed a worker's compensation claim. It did not. This fact by no means amounts, as the dissent alleges, to any acknowledgment that Hanvey was not laid off on October 19, 2000.
[3] The dissent asserts that the recitation of facts in this opinion "either omits or overlooks... significant evidence favorable to Hanvey," 922 So.2d at 877, and specifically lists six examples of "significant evidence" this opinion allegedly overlooks. However, like the trial court, the dissent fails to recognize that this "significant evidence" does not rebut the undisputed facts that form the basis of this Court's decision that there was no "termination" within the meaning of § 25-5-11.1.
[4] The dissent states:

"I suppose we are simply expected to draw only one inference from the evidence  that Hanvey would have been included in the recall in March 2001 even if he had not by then filed an action against Webb Wheel in which he contended that he was told on October 19 that Webb Wheel had to let him go because of his back."
922 So.2d at 878 (emphasis added). The fact that Hanvey filed a lawsuit before he was recalled should make no difference. The protection afforded by § 25-5-11.1 is against termination based solely upon the filing of a claim seeking workers' compensation benefits. We have concluded on the basis of the recall and the other three factors set forth earlier that, as a matter of law, Hanvey was not terminated. Quite simply, whether someone is terminated is rarely a question of disputed fact. That being said, Hanvey acknowledges that he did receive a letter from Webb Wheel recalling him. That the recall offer was made after Hanvey filed the present lawsuit does not change the fact that it was made. Although the decision-maker's motivation might be questioned, it does not make the offer of recall any less real.
[5] The main opinion relies on a recall letter written by Webb Wheel to Hanvey several months after Hanvey left Webb Wheel's employment. 922 So.2d at 873 n. 1. The quoted portion of Hanvey's testimony in the main opinion cannot fairly be read as an admission by Hanvey that it was appropriate to characterize his severance on October 19 as a layoff. In his testimony, Hanvey merely acknowledged that the letter said what counsel described it as saying. Moreover, that Webb Wheel described Hanvey's severance on October 19, 2000, as a "layoff" in a letter written several months after the fact and after Hanvey had filed suit against Webb Wheel does not make Webb Wheel's action on October 19 of the preceding year "undisputedly" a layoff. The jury had evidence from which it could reasonably have concluded that the letter was a self-serving act by Webb Wheel as a means of damage control taken after Hanvey had served Webb Wheel with a copy of his complaint in this action.
[6] The main opinion acknowledges, "Hill and Hanvey then went to Hill's office, where, Hanvey testified, Hill stated, `[W]e're going to have to let you go because of your back.'" 922 So.2d at 867 (emphasis added).
[7] The main opinion acknowledges, "As previously noted, [Hanvey] did sign the form, but the parties dispute how much of the form was completed when Hanvey signed it." 922 So.2d at 868 (emphasis added).
[1] It is difficult to discern from an appellate vantage point, where we are unable to observe hand gestures, what is meant by the reference to "this other material in the middle." See General Motors Corp. v. Jernigan, 883 So.2d 646, 664 (Ala.2003) ("Obviously Dr. Burton was gesturing at this point, and the record does not include a description of where the witness was pointing. Neither the California attorney who signed the appellate brief, the Birmingham attorney who presented oral argument on behalf of [General Motors], nor this Court had the opportunity to hear the evidence and to view the gestures of the witness as did the jury and the trial court."). Because the previous description of information on the exit report that was described as completed, such as name, date, etc., does not refer to the portion of the form stating, "Reason for Termination: Dismissed ____ Lay Off ____ Quit ____" and because this portion of the form containing the blanks appears in the middle of the material above the signature line, it is reasonable to conclude that Hanvey's testimony is consistent with the fact that none of those blanks were checked at the time he signed the exit report. An opposite conclusion would violate the rule requiring review of the evidence in a manner favorable to the nonmovant. See City of Birmingham v. Sutherland, [834 So.2d 755 (Ala. 2002)].